[No. S014356. Apr. 11, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
PEDRO ARIAS, Defendant and Appellant.

COUNSEL

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, John Fresquez and Alison Pease, Deputy State Public Defenders, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Margaret Garnand Venturi and Alison Elle Smith, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BAXTER, J.—In charges arising out of an incident on May 23, 1987, a jury convicted defendant Pedro Arias of one count of first degree murder (Pen. Code, §§ 187, 189)[1] and three counts of robbery (§ 211). As to each count, it was found true that defendant personally used a deadly and dangerous weapon, a knife. (§ 12022, subd. (b).) The jury also found, as a special circumstance under the 1978 death penalty law, that the murder occurred in the commission of a robbery. (§ 190.2, subd. (a)(17)(i).)

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

Additional charges arising from a separate incident on June 5, 1987, were tried jointly to the same jury. The jury convicted defendant of two counts of robbery, one count of kidnapping (§ 207, subd. (a)), one count of kidnapping for purposes of robbery (§ 209), two counts of vaginal penetration with a foreign object (§ 289, subd. (a)), two counts of attempted sodomy (§§ 286, subd. (c), 664), one count of forcible oral copulation (§ 288a, subd. (c)), and two counts of rape (§ 261, former subd. (2), now § 261, subd. (a)(2)). As to each count, it was found true that defendant personally used a firearm. (§ 12022.5, subd. (a).) In a bifurcated trial, the jury found that defendant had suffered a prior conviction for shooting into an inhabited dwelling (§ 246), and had served a prison term for that crime within five years before committing the current offenses. (§ 667.5, subd. (b).)

After a separate trial on the issue of penalty, the jury sentenced defendant to death for the murder. Defendant's automatic motion for modification of the death verdict (§ 190.4, subd. (e)) was denied. The trial court also sentenced defendant to a total of 69 years, 4 months, on the noncapital convictions and enhancements. This appeal is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).)

We find no prejudicial error affecting either the guilt or penalty trials. We will therefore affirm the judgment in its entirety.

## I. Facts

### A. *Guilt Trial.*

#### 1. *Beacon Gas Station Incident—May 23, 1987.*

In late May 1987, defendant, 24 years old, was living with a group in a house on Lemon Hill Avenue in Sacramento. For transportation, he was using his mother's 1968 red-primered Plymouth. The driver's door of the Plymouth was jammed, and because the passenger door would not latch, it had to be tied shut with a rope.

James (Jimmy) Valdez, a friend of defendant, had recently come to stay at the Lemon Hill house. He was contributing to the household by "boosting" (i.e., stealing) food. On May 23, 1987, defendant and Valdez spent the day drinking beer and tequila at the house. Sometime early in the evening, defendant's girlfriend, Yolanda Gomez, remarked that "[s]ince Jimmy's here, we got everything." Defendant responded by saying to Valdez, "Let's take a ride." Both men were intoxicated at this point, but defendant was able to speak, walk, and drive normally.

With defendant driving the Plymouth, the two men arrived at the Beacon gasoline station at 44th Street and Fruitridge Road. The station includes a small convenience store. Two clerks, Tina Cheatam and John Waltrip, were on duty inside the store. Each clerk was responsible for a particular cash register and had the only key for that register. Also in the store was Lawrence Galvin, a district manager for the Beacon chain.

Around 8 p.m., Waltrip and Galvin were in the rear of the store, restocking the display of cold beverages. Waltrip, who was out of sight in the storage cooler, was passing merchandise through to Galvin, who was standing in front of the beverage cases. Defendant and Valdez entered the store and walked toward the beverage cases. Valdez grabbed a 12-pack of beer and ran out.

As Cheatam yelled for Valdez to stop, defendant grabbed her from behind and held a knife to her hip. Galvin began to move forward, and defendant told him to "freeze." Defendant then ordered Cheatam to open her register. Cheatam was standing in front of Waltrip's register and tried to tell defendant she did not have the key to open it. Defendant grew angrier, shouted obscenities, and continued to demand money.

Cheatam became hysterical, pounded hopelessly on Waltrip's register, and indicated to defendant that the "other clerk" would have to open it. Defendant told her, "Well, get the guy out here." Cheatam then screamed "several times" for Waltrip. Waltrip finally emerged from the back room and said, "Here I am." Approaching from behind defendant, Waltrip stepped up onto the slightly elevated register area, causing the floor to creak. At this moment, according to Galvin, defendant turned, placed his left hand on Waltrip's right shoulder, pulled Waltrip toward him, drew back his right elbow to a 90-degree angle, and "very, very violently" thrust the knife into Waltrip's midsection. The blow made a "thunk" sound, like a fist hitting a punching bag. Waltrip doubled over and stumbled into the store's back office.

Meanwhile, Cheatam had managed to open her own register. Defendant reached in and swept the cash out of the till with a deft scooping motion. In doing so, he triggered a hidden camera, which sequentially photographed ensuing stages of the holdup. While the robbery was in progress, Edgar Calderon entered to pay for some gas, but Calderon withdrew when defendant told him to "get the hell out."

After cleaning out Cheatam's register, defendant brandished the knife at Galvin and forced him to lie down on the floor. Defendant then left.[2]

Outside, Valdez was waiting in the passenger seat of the Plymouth, puzzled by the delay and anxious to depart with the stolen beer. When defendant approached the car at a run, Valdez slid behind the wheel and defendant got in the passenger side. They sped away northbound on 44th Street. At the first intersection, Valdez started to turn right, but defendant told him it was a dead end, and Valdez swerved back onto 44th Street. As he did so, Calderon, who was keeping the vehicle in sight, saw the passenger door fly open.

After defendant had departed from the store, Galvin locked the front door and entered the back office. There Waltrip was lying unconscious with the telephone in his hand. Galvin took the telephone and called the police.

Waltrip died of his wound during emergency surgery. The cause of death was loss of blood. The knife had penetrated to a depth of nine or ten inches, passing completely through Waltrip's abdominal wall and liver and piercing the front wall of the aorta.

Defendant and Valdez returned to the Lemon Hill house and divided the money from the robbery, either $45 or $90. Valdez heard defendant tell Gomez he had robbed the Beacon store. Gomez's friend Sonya White also overheard this comment and defendant implied that White should forget what she had heard.

Later the same evening, defendant and Victor Trejo went on a quest to obtain drugs. They were driving a van owned by Trejo's father. Defendant had avoided using the Plymouth because it was "a little warm." At one point, Trejo wanted to return the van to his father, but defendant pulled a knife and held it to Trejo's neck. Defendant told Trejo he did not want to have to make a "movita," or move, on Trejo, "like he already did to someone else." Trejo complied with defendant's demand to continue on in the van.

Trejo eventually dropped defendant off at the Lemon Hill house. At defendant's request, Valdez then went with defendant in the Plymouth to obtain still more drugs. Late that night, defendant discussed the Beacon robbery and told Valdez, "I think I killed somebody."

---

[2] At trial, Galvin emphatically identified defendant as the robber with the knife who stabbed Waltrip. Asked how certain his identification was, Galvin replied, "Very certain." Edgar Calderon also positively identified defendant at trial, though Calderon observed that defendant had gained weight between the May 1987 robbery and Calderon's October 1989 testimony. Defendant's fingerprints were not found at the crime scene.

The next day, defendant and Valdez walked to a nearby store and bought a newspaper. The paper contained an account of the Beacon robbery, including a description of the red Plymouth. Defendant read the story and told Valdez "[t]hat the guy died at the gas station."

When defendant and Valdez returned from the store, defendant moved the Plymouth into the backyard of the Lemon Hill house, where the police later found it. Valdez asked defendant what he had done with the knife used to kill Waltrip. Defendant went to the kitchen and grabbed a knife, which Valdez described as about 12 inches long. Valdez took the knife and broke it up with his hands.[3] Valdez then made plans to "split" the Lemon Hill house immediately.

Sometime after the Beacon incident, defendant met his mother, Adeline Rodriguez, in a park. Crying, defendant told her he had robbed the Beacon station and killed a man there, though he "didn't mean to do that." According to defendant, somebody had grabbed his shoulder from behind, and he turned. Defendant said he did not want to go to prison and needed time to get away and think. A couple of days later, defendant called Rodriguez and asked for money.

About two weeks after the Beacon incident, Valdez saw defendant at McClatchy High School. Defendant told Valdez, "Don't worry about nothing, home boy, I ride my own beef." Defendant acted paranoid, said homicide detectives were at his house, and indicated he wanted to go to Mexico.

Defendant presented a single witness, Dr. Gwen Hall, a forensic pathologist. Based on the autopsy report, she disputed the depth of Waltrip's wound and opined that the autopsy findings were not consistent with a violent, audible knife blow such as Galvin had described. Asked to estimate the blood-alcohol level at 8 p.m. of a 170-pound man who had drunk 12 twelve-ounce beers and 6 glasses of tequila between 11 a.m. and 5 p.m., Dr. Hall opined that it would be between .17 and .27 percent. At that level, she suggested, such a person might appear normal, especially if he was a chronic drinker, but his judgment might still be grossly distorted by alcohol intoxication.

2. *Judy N. Incident—June 5, 1987.*

On June 5, 1987, 13 days after the Beacon incident, defendant borrowed a brown 1970's Plymouth owned by Nelda Smith. About 3 p.m. that day, Judy N. was driving eastbound in her 1986 Honda on highway 50, a freeway in

---

[3]The knife used to murder Waltrip was never recovered.

Sacramento. Defendant, driving the brown Plymouth, came into her lane from the right and bumped the right front fender of her car. She signalled defendant to pull over, and they both parked on the shoulder just west of the 51st Street overpass.

After they inspected the minor damage, defendant advised that he had no insurance. Ms. N. suggested they exchange names and telephone numbers. She reentered her car to obtain writing paper and a pen. She offered him the pen, which he refused. She then used the pen to write her own name and telephone number, as well as the license number of defendant's car. She tore off the license number and began to hand defendant the remainder of the paper. As she did so, he reached in the driver's window and wadded up the paper. Startled, she looked up to see him pointing a revolver at her.

Defendant demanded Ms. N.'s purse and wallet. She said she had only 23 cents with her and opened her wallet to show that it contained no cash. Defendant asked if she had automatic teller machine (ATM) cards, and she acknowledged that she did. She then complied with defendant's instructions to bring her purse and wallet, follow him, and get into the passenger seat of the brown Plymouth. Defendant entered the driver's side and placed the gun in his lap, pointed at her. He asked the location of the nearest machine that would accept her ATM card. She mentioned the "college campus" nearby and said she would try to direct him from the next freeway exit, at 59th Street.

Defendant began to drive, meantime instructing Ms. N. to remove all her clothing below her waist. He said this was to keep her from trying to get away. She took off her shoes, jeans, pantyhose, and underpants.

Defendant left highway 50 at the 59th Street exit, but then doubled back westbound on S Street, which runs parallel to the south side of the freeway. Near the intersection with 55th Street, defendant parked and told Ms. N. they were going to return to her car. At his direction, she put her jeans and shoes back on, and defendant put her underpants in his pocket. The two then climbed over a chain link fence and clambered down a steep embankment to the freeway. Eventually they arrived on foot at her vehicle.

Defendant directed Ms. N. to get behind the wheel, again remove her jeans and shoes, and begin driving. She did so. He asked about her husband and children, the family's financial status, and their credit and ATM cards. Because she feared for their safety, she told defendant falsely that she had no children. She also advised, among other things, that she and her husband had ATM cards for Golden One Credit Union and Sacramento Savings. Defendant said, "We'll go to the Golden One. I know where there's a Golden One."

He began to direct her, by freeway and surface road, in a southwesterly direction through Sacramento.

As they drove, defendant demanded Ms. N.'s watch and wedding ring. She handed them over. Defendant pulled out her underpants, began to fondle them, and asked questions about her sex life. At length, he held the gun on her and said "I want you to play with yourself like you've never done before." At his direction, she inserted her finger in her vagina. Defendant then reached over and inserted his own finger in her vaginal opening.

While they were en route, they passed a number of police cars, and this caused defendant to become more and more agitated. On several occasions, he advised Ms. N. to drive carefully and avoid attracting attention. Each time, he warned that he had killed before, and it would not bother him to kill again. He indicated that the killing had occurred about two weeks before, and he asked if she had read about it in the newspaper.

At length, they were travelling westbound on Florin Road, and they seemed to be headed toward the Golden One branch at Florin Road and interstate 5. Before they reached that location, however, defendant instructed Ms. N. to turn left. When she said, "I thought we were going to the credit union," he replied with a smirk, "We'll get there."

Eventually they crossed the Sacramento River into Yolo County. In a rural area, they left the paved highway and travelled on a dirt road. Finally they arrived at an isolated clearing. At defendant's direction, Ms. N. got out, went to the back of the car, placed her hands on the bumper, and leaned over. Defendant pulled down his pants and pressed his penis against her anus. He then told her to take off the rest of her clothes. She did so, dislodging an earring in the process.

When Ms. N. was naked, defendant said, "Have you ever sucked [expletive]?[4] Well, you're going to, now. Come here." He pushed her head down, causing his penis to penetrate her mouth. He continued to push on her head, saying, "Move. Move harder."

Defendant next directed Ms. N. back into some trees where there was another clearing. He said, "Now, we're going to do it doggy style." At his direction, she got down on her hands and knees on his T-shirt. Defendant knelt behind her and remarked, "Nice white ass." Again he pressed his penis against her anus. Then he penetrated her vagina with his penis.

[4]According to Ms. N., "[defendant] said, 'Have you ever sucked—' and he said some ugly word. I don't remember what it was."

Defendant eventually withdrew and said he wanted a blanket. Ms. N. told him there was one in the back of her car. He returned with the blanket and spread it on the ground. At his direction, she lay down on the blanket, whereupon he entered her vagina with his penis a second time. During this rape, defendant thrust hard and bit her breast.

Defendant and Ms. N. then returned to her car. Defendant opened the trunk, got out her purse, and removed ATM cards for two different Golden One accounts. At his direction, she told him the personal identification numbers for these cards, and he wrote the numbers down. He then tied her hands with his belt and put a gag in her mouth. Displaying the gun, he ordered her into the trunk.

From inside the trunk, Ms. N. felt the car return to the paved road, recross the bridge into Sacramento County, and continue. After awhile, the car stopped for several minutes, than began moving again. When it stopped a second time, defendant got out and opened the trunk. They were back in Yolo County, at the isolated clearing where the assaults had occurred.

Defendant ordered Ms. N. out of the trunk and untied her hands. At his direction, she put her T-shirt back on and got behind the wheel. He told her to remove the gag. In doing so, she dislodged her other earring.

Ms. N. then began driving back toward Sacramento, as defendant instructed. Before they reached the bridge, he ordered her to stop on the shoulder. He said he had already gotten money from one of her ATM cards, and he showed her the receipt, but he seemed frustrated at some aspect of the transaction. He asked where her Sacramento Savings card was. She said it had been on the passenger seat when their collision occurred and must have fallen on the floor of the car. At his direction, she put her jeans back on, searched for the card, and found it. He asked how much money he could get with this card, and she said $900.

Defendant began looking through Ms. N.'s purse, then noticed she was wearing a gold necklace with a Disneyland pendant. He told her to take off the necklace and put it around his neck. Her hands trembled, however, and she could not work the clasp. Defendant unfastened the necklace himself.

Defendant ordered Ms. N. to remove her jeans again and resume driving. As they proceeded, he turned his attention once more to her purse and wallet. Finding photographs of her children, he angrily reminded her that she had claimed to be childless. She told him the pictures were of her nieces and nephews. Defendant responded, "If you're lying to me, I'll blow you away,

right now. Don't lie to me. If I find somewhere on these pictures that says 'Mom' anywhere, you're dead." Defendant also became angry when he found a $20 bill tucked in a side pocket of her wallet. She told him truthfully that she had forgotten about the bill. Defendant took it.

Defendant directed Ms. N. to the Golden One branch located in a shopping center at Mack Road and Franklin Boulevard in Sacramento. He ordered her to park and wait. He cradled the revolver in his left arm and draped his T-shirt over it. He then emerged from the car and got into the ATM line. Ms. N. noticed a security guard and sensed a chance to escape. Still naked from the waist down, she snatched her jeans, got out of the car, pointed to defendant, and shouted that he had a gun. She then ran into a nearby hardware store.

Around 6 p.m. on June 5, 1987, Linda McCord had parked her yellow 1974 Ford pickup next to the Golden One ATM at Mack Road and Franklin Boulevard. She did some grocery shopping, returned to the truck with her purchases, placed them in the truck bed, and entered her vehicle. As she attempted to start her engine, she heard a loud thump and felt the truck move. She looked around and saw a man with a gun in the bed of the truck. At the same time, she heard voices saying, "He has a gun," and saw people ducking behind cars. The man told her to get out of her truck. He then came around to the driver's window, still brandishing the gun. He opened the door and slid into the driver's seat. As he did so, McCord escaped out the passenger door, leaving her keys in the ignition.

When the police arrived, they directed McCord to go into the hardware store. There she was told to stand next to Ms. N. During the time they were together, Ms. N. was visibly upset. Ms. N. said two things over and over to McCord. One was a warning that "[w]hatever you do, never get in a car." The other was a declaration that her abductor had stated to her, "Haven't you been reading about me in the papers? I'm the man who killed the man in the Beacon Gas Station."

Shortly after 6 p.m. on June 5, 1987, Sacramento police officers Steven Spillmer and Henry Luckie, in separate cars, were parked in the Mack Road shopping center discussing police business. A man approached and told the officers about a naked woman and someone with a gun near the Golden One ATM. Spillmer responded. When he reached the ATM, witnesses told him that the gunman had fled northward on Franklin Boulevard. Spillmer pursued and soon spotted a yellow pickup travelling erratically at high speed. Spillmer followed, keeping the pickup in sight through several turns until the truck hit a curb in a residential neighborhood and rolled over.

Defendant was arrested in the truck, which belonged to McCord. Various items of Ms. N.'s property, including the ATM cards, were found on his person at the scene. A loaded handgun was also recovered from the truck.

Defendant was transported to a hospital for treatment of injuries sustained in the rollover. Ms. N. was taken to the same hospital for a medical examination. While there, she spontaneously observed defendant and identified him as her assailant. She identified him again at trial.

Police recovered $423 in cash (21 $20 bills and 3 $1 bills) from under the mattress of defendant's hospital gurney. Also retrieved from defendant's person or clothing at the hospital were Ms. N.'s necklace, watch, and wedding ring, an ATM receipt on Ms. N.'s Golden One account, and a live .22-caliber bullet.

An employee of Golden One confirmed that between 5:21 p.m. and 5:24 p.m. on June 5, 1987, ATM withdrawals of $200 each, the maximum daily allowance, were made from two separate accounts belonging to Ms. N. and her husband. The cash was supplied in $20 bills. The withdrawals were made from the Florin Road branch, and the person who made them was video-taped. Six unsuccessful attempts to withdraw money from the same accounts were made at the Mack Road ATM between 6:18 p.m. and 6:21 p.m. the same day. These transactions were also videotaped. Neither Ms. N. nor her husband used their Golden One ATM cards on June 5, 1987.

Defendant's fingerprints were found on the brown Plymouth. They were also found at several locations on Ms. N.'s Honda. Her earring was located at the remote Yolo County location she described as the site of the sexual assaults.

B. *Penalty Trial.*

1. *Prosecution Case-in-chief.*

a. *Rypich Robbery—June 6, 1979.*

On June 6, 1979, Daniel Rypich, then 64 years old, and his wife Lucy were returning to their car after purchasing groceries at the Farmers Mart in Sacramento. Defendant, then 16 years old, grabbed Daniel around the neck from behind and held a knife in his back. Defendant told Daniel to hand over all his cash or he would be killed. Daniel gave defendant $223. As defendant fled from the scene, a rust-colored Chevrolet, license No. CEA 026, picked him up and sped away. A witness provided the police with the license

number. Defendant was arrested driving the car the next day. Daniel never saw defendant's face, but two days after the robbery, Lucy positively identified him from a photo lineup. She also emphatically identified him at the juvenile proceeding arising from the incident.[5] Beatrice Arriaga, defendant's girlfriend in 1979, testified he told her "he got 200 [dollars] from the old man" at the Farmers Mart.

b. *Priscilla Lane Shooting Incident—August 14, 1981.*

Around 11 p.m. on August 14, 1981, James Barger was in the driveway of his house on Priscilla Lane. He heard a shot. Moments later, a car turned onto Priscilla Lane from Fruitridge Road. Defendant, wearing a long coat, emerged from the back of the car. A female voice shouted, "There he is," whereupon defendant pulled a rifle from the car and fired into the yard of the corner house, 5571 Priscilla Lane. Defendant then ran in the direction of his shots and disappeared from Barger's view. Barger heard the sound of gunfire five more times.

Barger entered his own house, told his wife to call the police, and returned outside with a .45 automatic. Someone in the car shouted, "Get out of here," and the vehicle sped away. As it did so, defendant, who was still carrying the rifle, ran past Barger. Barger leveled his pistol at defendant's back and ordered him to freeze. Defendant dropped the rifle and approached Barger, who instructed him to lie down in the street. A crowd of Black and Hispanic youths assembled. In their protective company, defendant got up and walked around the corner onto Fruitridge Road. Barger followed, keeping defendant in sight.

When the police arrived, Barger pointed out defendant in the crowd. Defendant was arrested, handcuffed, and placed in a police car with another suspect in the incident. In their conversation, which was tape-recorded, defendant threatened to return and kill Barger.

When police entered the back-yard of 5571 Priscilla Lane, they found Andrew Benanato cowering under a bush. Spent shell casings and bullet strafe marks were discovered nearby.

c. *High-speed Chase Incident—July 22, 1985.*

In the early afternoon of July 22, 1985, Ernest Daniels, a plainclothes narcotics officer, was parked in an unmarked vehicle on 38th Street at 22nd

---

[5]Daniel died prior to the instant penalty trial, and Lucy was in ill health. Because both witnesses were unavailable, their testimony from the 1979 juvenile proceeding was read to the penalty jury.

Avenue, near a house where drug activity was suspected. Defendant's car stopped in front of the house. Suspicious, Daniels emerged from his own car, displayed his badge, announced his identity, and approached defendant's car. Defendant sped away on 38th Street, a narrow residential road. Daniels gave chase, activating his siren and red light. Another police car tried to cut defendant off at 20th Avenue but was forced to swerve aside to avoid a collision. Defendant ran a stop sign at 21st Avenue and violated a yield sign at 19th Avenue. Children playing in the street had to scramble to safety. The pursuit ended at 16th Avenue, where defendant was arrested for resisting an officer. Two locking-blade knives were found on his person.

> ### d. *Chief's Auto Parts Store Robbery—February 16, 1987.*

Late on the evening of February 16, 1987, Richard Lam was working as assistant manager of the Chief's Auto Parts Store on Broadway in Sacramento. John Geddes was the other employee in the store. Defendant and another man entered, inquired about a part, and left. An hour later, they returned, pressed knives into the backs of Lam and Geddes, and ordered them to lie down. Defendant attempted to open the register, and when unable to do so, ordered Lam to open it. Defendant took the bills from the register and left. Meanwhile, defendant's accomplice tore loose a television set that was bolted to a shelf. Carrying the television, the accomplice followed defendant out of the store.

> ### e. *Assault and Robbery of "Joe"—May 23, 1987.*

On the evening of the Beacon robbery and murder, defendant and James Valdez later went to a house on 20th Avenue to negotiate a $20 purchase of heroin. Among the persons present, according to Valdez, were "this lady" and "this guy named Joe." Valdez indicated he had only $15 and asked for partial credit. The lady refused. Instead, she handed Valdez a bag containing $10 worth of heroin. Valdez immediately injected this entire amount, telling defendant, "Well, I tried to help you, home boy, but I can't. All I got is a dime [i.e., $10]."

Defendant became angry and ran toward the lady, brandishing a knife. Joe got up to meet him. The two men fell to the floor, and a struggle ensued. Joe was cut on the hand while defending himself from defendant's knife. When the lady screamed for Valdez to "do something," Valdez replied, "See, I told you [you] should have gave us the dope." The lady handed Valdez another bag of narcotics. Valdez then approached defendant, who was still struggling with Joe, and said, "Hey, Pete, Pete, I got the dope." Defendant stopped fighting, jumped up, snatched "all the dope and money," and ran out to the car.

f. *Assault on Miguel Pina—May 26, 1987.*

On May 26, 1987, three days after the Beacon incident, defendant's girlfriend, Yolanda Gomez, telephoned Miguel Pina, a high school acquaintance, and asked him to meet her at a store near Pina's residence. When Pina arrived, Gomez told him she was in some trouble. They began to walk and talk. Suddenly, defendant appeared and hit Pina on the head with a pistol. As Pina reeled backward, defendant screamed, "Who the fuck are you? What the fuck are you doing here?" Defendant held the gun to Pina's head and asked several times, "Do you want to know how it fucking feels to die?"

Defendant asked Gomez who Pina was. She said he was a stranger from whom she had asked directions. Pina agreed, and told defendant he was just going to the store. Defendant forced Pina against a wall and ripped off Pina's necklace, scratching Pina's neck. Defendant threw the necklace down when he realized it was fake gold. Finally, defendant told Pina to "[g]o into the store if that's where you're going to," and released him. Pina went into a nearby store, where a woman gave him napkins for his bleeding head. Pina's pistol-whipping wound required five stitches at a hospital.

2. *Defense Evidence.*

Defendant presented witnesses to show that he had suffered a neglected and chaotic childhood, that some people still cared for him, that he had expressed remorse for Waltrip's murder, and that he could adjust to life imprisonment.

Delores Garcia, a friend since childhood, testified that she intended to marry defendant despite his situation. Garcia said defendant sent her daughter drawings and a tender letter from jail. Marie Alvarado, Garcia's mother, testified that defendant had always been respectful to her, always called her "mom," and expressed remorse about the Beacon incident. He wrote to her from jail when she was in the hospital with pneumonia.

Several witnesses described defendant's chaotic childhood. Relatives said that defendant's mother, Adeline Rodriguez, was a sloppy housekeeper who drank heavily and neglected her children. Two witnesses described a time when the children were left in the care of a disturbed young man who tried to cut his veins in the children's presence. Leonard Sanchez, who lived with Rodriguez when defendant was age eight, said the family had no standards, and that drug use was rampant "from the youngest to the oldest." According to Sanchez, defendant's older brother introduced defendant to drugs, stealing, and burglary. Sanchez himself sold defendant alcohol.

Rodney Hall supervised a foster home where defendant was temporarily placed at age 11. Hall said defendant was stubborn and angry at first, but his attitude improved over time. Hall developed a rapport with defendant through their mutual interest in auto mechanics. On one occasion, defendant intervened to help Hall's wife when another resident threatened her with a knife. Hall was concerned for defendant when the home was forced to close two years later, and defendant was returned to his family.

Several jail guards and a jail psychiatric nurse indicated that defendant is hot-tempered and retaliates when provoked, but he respects authority and his disciplinary record while in jail awaiting trial was at least average. These witnesses suggested that defendant might well adjust to long-term prison life without presenting unusual problems. Testifying as an expert on the state penal system, Jerry Enomoto, former Director of the Department of Corrections, voiced similar opinions after reviewing defendant's prison file.

Finally, defendant presented the expert testimony of Dr. Albert Globus, a psychiatrist and neurologist. After interviewing defendant, running a number of neurological tests, and reviewing defendant's personal and medical histories, Dr. Globus opined that defendant shows signs of organic brain damage which would diminish his judgment, his impulse control, and his capacity to intend Waltrip's murder. In Dr. Globus's view, causes of this condition might include Rodriguez's drinking while she was pregnant with defendant, defendant's own lifelong drug and alcohol abuse, and an untreated illness during defendant's infancy which may have included a brain infection.

Dr. Globus conceded that defendant also exhibits a form of antisocial personality independent of brain damage. Moreover, Dr. Globus acknowledged that defendant's intent to rob the Beacon store was not affected by any organic condition.

### 3. *Prosecution Rebuttal.*

In rebuttal, the prosecution presented the testimony of Dr. Michael Adelberg, a neurologist. Having reviewed Dr. Globus's report, Dr. Adelberg disputed all bases for Dr. Globus's opinion that defendant suffers from organic brain damage. Dr. Adelberg concluded that the results of tests administered by Dr. Globus showed no brain damage but were consistent with a diagnosis of antisocial personality.

## II. Discussion

### A. *Pretrial and Jury Selection Issues.*

#### 1. *Severance.*

Prior to trial, defendant moved to sever counts 1 through 4 (the Beacon murder and robberies) from counts 5 through 15 (the offenses against Judy N.). The trial court denied the motion.

Defendant now claims the court's ruling was prejudicially erroneous. He argues that joinder of the two incidents unfairly portrayed him as a "bad man" who should be convicted on all charges regardless of the evidence. In particular, he urges, the strong and "inflammatory" Judy N. counts improperly bolstered the prosecution's marginal case for death eligibility, because the evidence that he intended to kill John Waltrip, a crucial element of the single robbery-murder special circumstance, was weak.[6] These contentions lack merit.[7]

Two or more offenses "of the same class," or "connected in their commission," may be charged and tried together, but the trial court may sever counts in the interest of justice. (§ 954.) When exercising its discretion, the court must balance the potential prejudice of joinder against the state's strong interest in the efficiency of a joint trial. (*People* v. *Bean* (1988) 46 Cal.3d 919, 935-936 [251 Cal.Rptr. 467, 760 P.2d 996].)

Joinder is generally proper when the offenses would be cross-admissible in separate trials, since an inference of prejudice is thus dispelled. (*People* v. *Davis* (1995) 10 Cal.4th 463, 509 [41 Cal.Rptr.2d 826, 896 P.2d 119]; *People* v. *Sully, supra,* 53 Cal.3d 1195, 1222; see *Frank* v. *Superior Court* (1989) 48 Cal.3d 632, 639 [257 Cal.Rptr. 550, 770 P.2d 1119].) However,

---

[6] The murder of Waltrip occurred after our decision in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], but before *Carlos* was overruled in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]. Therefore, intent to kill was an element of the robbery-murder special circumstance, even though all the evidence indicated that defendant was the actual killer, not a mere aider and abettor. (*People* v. *Duncan* (1991) 53 Cal.3d 955, 973, & fn. 4 [281 Cal.Rptr. 273, 810 P.2d 131]; *In re Baert* (1988) 205 Cal.App.3d 514 [252 Cal.Rptr. 418].)

[7] Proposition 115, adopted by the voters in June 1990, included several new constitutional and statutory provisions on the subject of joinder and severance. (See Cal. Const., art. I, § 30, subd. (a); Pen. Code, § 954.1.) However, defendant was tried prior to the effective date of Proposition 115. Therefore, although we do not perceive that Proposition 115 materially changed the law on the issues before us, we apply pre-Proposition 115 law in our review of defendant's severance claims. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1222 [283 Cal.Rptr. 144, 812 P.2d 163].)

joinder is often permissible even when cross-admissibility is not present. Because of the factors favoring joinder, a party seeking severance must make a stronger showing of potential prejudice than would be necessary to exclude other-crimes evidence in a severed trial. (*Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 451 [204 Cal.Rptr. 700, 683 P.2d 699].) In determining potential prejudice from the joint trial of non-cross-admissible charges, the court should evaluate whether (1) certain of the charges are unduly inflammatory, (2) a "weak" case will be unfairly bolstered by its joinder with other charges, and (3) any of the charges carries the death penalty. (See *Davis, supra,* 10 Cal.4th at p. 508; *People* v. *Balderas* (1985) 41 Cal.3d 144, 173 [222 Cal.Rptr. 184, 711 P.2d 480].)

To demonstrate that a denial of severance was reversible error, defendant must " 'clearly establish that there [was] a substantial danger of prejudice requiring that the charges be separately tried.' " (*People* v. *Davis, supra,* 10 Cal.4th at p. 508, quoting *Frank* v. *Superior Court, supra,* 48 Cal.3d at p. 640.) We examine a pretrial severance ruling on the record then before the court. (*People* v. *Davis, supra,* 10 Cal.4th at p. 508.) Even if the ruling was correct when made, we must reverse if defendant shows that joinder actually resulted in "gross unfairness," amounting to a denial of due process. (*People* v. *Johnson* (1988) 47 Cal.3d 576, 590 [253 Cal.Rptr. 710, 764 P.2d 1087].) ▄▄▄ For the multiple reasons that follow, defendant has not sustained his burden.

When ruling on the motion to sever, the trial court carefully weighed all the pertinent issues. Defendant does not dispute the court's correct threshold determination that the offenses, all involving assaultive behavior, were of the same class, and thus properly joinable. (*People* v. *Lucky* (1988) 45 Cal.3d 259, 276 [247 Cal.Rptr. 1, 753 P.2d 1052]; *People* v. *Balderas, supra,* 41 Cal.3d at p. 170.)

Though defendant argues otherwise, the court also properly concluded that the pretrial record provided "some evidence" of cross-admissibility on issues of motive, identity, and consciousness of guilt. (Evid. Code, § 1101, subd. (b).)[8] As the court noted, there was evidence that the kidnapping and robbery of Judy N. was impelled by defendant's need for money and transportation to escape apprehension for the Beacon crimes, which occurred 13 days earlier. Hence, the Beacon incident supplied evidence of motive for the Judy

---

[8]Evidence Code section 1101, subdivision (a), establishes the general rule that except as otherwise provided, evidence of a person's conduct on one occasion is not admissible to prove his conduct on another, but subdivision (b) makes clear that "[n]othing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, [or] identity . . .) other than his or her disposition to commit such an act."

N. robbery, which in turn indicated consciousness of guilt in the Beacon matter.

Moreover, the court cited the prosecution's representations that during Ms. N.'s ordeal, defendant terrorized her with repeated death threats, boasting that he had killed before and it would not bother him to kill again. Such statements, the court reasoned, would be competent circumstantial evidence of defendant's identity as the killer of John Waltrip.[9]

Defendant argues that the circumstances of the Judy N. robbery are not within the narrow range of evidence traditionally deemed material to consciousness of guilt. On the contrary, both the pretrial record and the trial itself included evidence that the offenses against Ms. N. were an outgrowth of defendant's specific desire to flee apprehension for the Beacon crimes, of which he knew he was suspected. (See fn. 9, *ante*.) This evidence thus logically supported an inference of consciousness of guilt in the Beacon matter. (See, e.g., *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1243-1244 [278 Cal.Rptr. 640, 805 P.2d 899].) The trial court also correctly determined that defendant's admissions to Ms. N. about a prior killing would be valid circumstantial evidence of his identity as John Waltrip's murderer. (*People* v. *Johnson* (1993) 6 Cal.4th 1, 34 [23 Cal.Rptr.2d 593, 859 P.2d 673].)

We therefore agree that the two incidents were cross-admissible. "On that ground alone, there was no abuse of discretion" in denying severance. (*People* v. *Davis*, *supra*, 10 Cal.4th 463, 508.) But the trial court did not rest its ruling exclusively on cross-admissibility. Instead, the court carefully considered other factors bearing on potential prejudice. In particular, it concluded that the evidence in both cases was "very strong," so that a weak case would not receive unfair support from the joinder of offenses committed at a different time.

---

[9]Defendant claims the pretrial *evidence*, as opposed to the prosecutor's representations, does not support these theories of cross-admissibility, since the preliminary hearing included no evidence that defendant robbed Ms. N. to obtain escape money or told her he had killed before. However, the trial court made clear that it was also considering evidence presented in the course of various pretrial motions. Among that evidence were taped police interviews with defendant's mother, Adeline Rodriguez, and with defendant himself. Rodriguez described at length defendant's request for money to "get away and think" after the Beacon murder. In defendant's interview, he admitted the Beacon robbery/murder and stated that, in using Judy N.'s ATM cards, he "just wanted enough money to get out of town." Though these tape recordings were not introduced at trial, the trial testimony of Rodriguez and James Valdez supported the inference that the Judy N. robbery was motivated by a desire to flee the consequences of the Beacon crimes. Defendant is correct that the pretrial record makes no reference to statements by Ms. N. herself that defendant claimed to have killed before. However, the prosecution's representations that such evidence would be presented at trial were later fulfilled, and defendant thus suffered no prejudice. Indeed, the prosecution's efforts to elicit such testimony from Ms. N. at the preliminary hearing were withdrawn only after defendant's counsel vigorously objected.

Again, the court's reasoning is convincing. Both at the preliminary hearing and at trial, the evidence establishing defendant as Waltrip's killer and Judy N.'s assailant was overwhelming. Defendant claims, however, that joinder of the Judy N. crimes prejudiced him on the issue of death eligibility because the evidence of his intent to kill Waltrip was weak. We are not persuaded. Without regard to the Judy N. crimes, the prosecution presented strong evidence that the Beacon murder was intentional.

The defense theorized that defendant stabbed Waltrip reflexively when surprised by the victim's sudden presence behind him, and that intoxication negated defendant's ability to intend a killing. However, James Valdez testified that despite their alcohol consumption, defendant was functioning normally. That assessment is supported by defendant's activities; he drove to, robbed, and made good his escape from, the Beacon store. Indeed, he had the presence of mind to warn Valdez, during the getaway, that a turn Valdez was trying to make would lead to a dead end.

Furthermore, the evidence suggests that Waltrip's appearance behind defendant was neither sudden nor surprising, but was the direct result of defendant's own insistence that Waltrip be summoned to open his cash register. When defendant demanded that Tina Cheatam open Waltrip's register, she explained that only the "other clerk" had the proper key. Defendant ordered her to "get the guy out here," and she responded by calling several times for Waltrip to come forward. According to eyewitness Galvin, Waltrip announced his approach with the words, "Here I am." These facts belie defendant's theory of a purely reflexive act impelled by surprise.

Most persuasive of all is the evidence of the manner in which Waltrip was killed. Galvin testified that as Waltrip approached, defendant reached up, pulled Waltrip toward him, drew his elbow far back, and struck a violent, audible knife blow into Waltrip's body. This account was consistent with the autopsy surgeon's finding that the blade penetrated to a depth of nine or ten inches, piercing firm abdominal and liver tissues in the process.

From all this evidence, a jury instructed on intent to kill, as this jury was, could readily find that at the moment of the stabbing, defendant acted with a specific lethal purpose. On its own merits, the direct and circumstantial evidence of homicidal intent was not only legally sufficient, but convincing.[10] Under such circumstances, there is little chance that defendant's crimes against Judy N. tipped the balance toward a finding that he intended

---

[10]Defendant claims the evidence of specific intent to kill, as opposed to mere recklessness, reflex, or intent to frighten, is no stronger than in several other cases where we reversed felony-murder special circumstances for so-called "*Carlos* error." (*Carlos* v. *Superior Court*,

to kill Waltrip. Thus, he fails to demonstrate that the denial of severance was an abuse of discretion, or that it resulted in "gross unfairness" at his trial. Accordingly, we reject his claim.[11]

### 2. *Defendant's Plea Offer—Judy N. Counts.*

After severance had been denied, and before jury selection began, defendant renewed a motion previously withdrawn that he be allowed to plead guilty to all the charges involving Judy N. and Linda McCord (counts 5 through 15), including the related enhancements, and that the prosecution thereafter be barred from presenting evidence about those crimes. Defendant further offered not to assert the plea as a bar to Ms. N.'s "sanitized" testimony that on June 5, 1987, defendant told her he had killed before and would kill again.

The prosecutor opposed the motion, urging as before that the circumstances of the Judy N. incident bore on consciousness of guilt and identity in the Beacon case. The prosecutor also argued that the facts surrounding defendant's threats against Ms. N. bore on his intent to kill John Waltrip. The trial court denied the motion without prejudice, stating that it could not accept defendant's conditions before hearing the prosecution evidence. The court invited defendant to renew his motion at a later time. Defendant never renewed the motion, and no guilty plea was entered.

Defendant urges that the prosecutor wrongly opposed his motion and that the trial court erroneously denied it. He asserts that the conditions he offered eliminated all legitimate bases for cross-admissibility of the two incidents. Thus, he complains, the People's insistence on a trial of the Judy N. counts

---

*supra*, 35 Cal.3d 131; see also *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826].) In those cases, however, we concluded only that the evidence of intent to kill was not so conclusive as to render harmless an erroneous *failure to instruct* on that issue. (See, e.g., *People* v. *Ratliff* (1986) 41 Cal.3d 675, 697-698 [224 Cal.Rptr. 705, 715 P.2d 665]; *People* v. *Hayes* (1985) 38 Cal.3d 780, 787-788 [214 Cal.Rptr. 652, 699 P.2d 1259]; *People* v. *Ramos* (1984) 37 Cal.3d 136, 147-148 [207 Cal.Rptr. 800, 689 P.2d 430]; *People* v. *Whitt* (1984) 36 Cal.3d 724, 735 [205 Cal.Rptr. 810, 685 P.2d 1161].) Here, the jury was instructed, in accordance with *Carlos*, that in order to sustain the robbery-murder special circumstance, it must find that defendant intended to kill. There was legally sufficient, and indeed strong, evidence to support that determination.

[11]Defendant argues that two other factors, the "inflammatory" nature of the Judy N. case and the presence of capital charges, compelled severance. There is no doubt that defendant subjected Judy N. to a harrowing and degrading ordeal. However, "[b]y the sad standards of the . . . 1980's [and 1990's], [the Judy N. crimes] were not particularly brutal, repulsive, or sensational." (*People* v. *Balderas*, *supra*, 41 Cal.3d 144, 174.) Moreover, even where capital charges are involved, "consolidation may be upheld on appeal where the evidence on each of the joined charges is so strong that consolidation is unlikely to have affected the verdict. [Citation.]" (*People* v. *Lucky*, *supra*, 45 Cal.3d 259, 277.)

was intended only to cause him unfair prejudice in the Beacon case. We find no error or impropriety.

In essence, defendant, having lost his bid for severance, offered to stipulate to his commission of the Judy N. crimes in order to keep them from a jury considering his guilt of the Beacon crimes. But "[t]he general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness. [Citations.]" (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1007 [254 Cal.Rptr. 586, 766 P.2d 1]; see also *People* v. *Garceau* (1993) 6 Cal.4th 140, 182 [24 Cal.Rptr.2d 664, 862 P.2d 664].)

As the prosecutor argued, defendant's proposed stipulation was not an adequate substitute for trial evidence showing the relevance of the Judy N. offenses to the Beacon crimes. Defendant did not offer to admit his consciousness of guilt of the Beacon murder and robbery, or that he was John Waltrip's murderer. Had the circumstances of the Judy N. crimes been withheld from the jury, the People would have lost material circumstantial evidence on these issues.

Thus, the prosecutor could not have shown that the Judy N. robbery was motivated by a need for money and transportation to escape apprehension for the earlier Beacon crimes. Moreover, defendant's boast that he had killed two weeks before was strong circumstantial evidence of his identity as Waltrip's killer. If this statement had been artificially divorced from its context, it would have lacked the weight it deserved on that issue.

Without knowledge of the surrounding circumstances, the jury could not have evaluated whether defendant's statement was mere idle jest or braggadocio, entitled to little credence. But the fact that defendant repeated this murderous boast many times as a threat intended to facilitate further armed felonies was a material indication that his claim of a prior killing was true. The prosecution was entitled to present this information, and the jury was entitled to hear it.

As noted above, the prosecutor also argued that defendant's threats to Judy N., and the circumstances in which they were made, were admissible as evidence that defendant *intended* to kill Waltrip. Defendant now contends the two incidents were not sufficiently similar to allow use of the Judy N. incident to prove intent to kill in the Beacon case. The point is immaterial, however, since as we have indicated, the challenged evidence was admissible on other grounds.

■ Defendant claims the record contains evidence that the prosecution's insistence on capital charges and a full joint trial of both incidents was in

bad faith. In particular, he asserts (1) the prosecution was improperly influenced by the Judy N. crimes when deciding whether to seek the death penalty for the Beacon murder, (2) joinder of the Judy N. charges was intended to persuade the jury, even at the guilt phase, that he deserved death, and (3) use of his threats against Judy N. to prove his intent to kill Waltrip was improper because the prosecution actually did not believe he stabbed Waltrip with lethal intent.

These arguments are based primarily on a pretrial telephone conversation between defendant and Assistant District Attorney Patrick Marlette, to whom defendant's case was then assigned. The call was initiated by defendant. Marlette made notes of the conversation, and his portion of the dialogue was tape-recorded.

During the call, defendant sought a bargain whereby he could plead guilty to the Beacon murder, even if that meant the death penalty, but on condition that the sex charges involving Judy N. be dismissed so they would not be on his record when he was executed. Marlette cautioned that defendant should not be speaking to him, since "it's my job to see that you're executed." Marlette refused to dismiss the Judy N. charges, noting that he had defendant "wrapped up pretty tight" and that "I've got a rape victim out there [who] as much as anybody else deserves to have her crime represented." During a discussion of the Waltrip murder, Marlette remarked that "it looked to me like for a split second there you were not absolutely in control of the situation. And in that split second, the first thing you just like instinctively did was reach out and cut the dude."[12]

Nothing in this conversation demonstrates the bad faith defendant asserts. There is no inherent impropriety in a prosecutorial decision to join capital and noncapital charges, where, as here, joinder is otherwise proper. (See discussion, *ante*, at pp. 126-129.) Moreover, absent a showing of arbitrary and invidious discrimination, prosecutors have wide latitude when selecting those eligible cases in which the death penalty will actually be sought. (*People* v. *Keenan* (1988) 46 Cal.3d 478, 505-507 [250 Cal.Rptr. 550, 758 P.2d 1081]; cf. *McCleskey* v. *Kemp* (1987) 481 U.S. 279 [95 L.Ed.2d 262, 107 S.Ct. 1756].) Among the "[m]any circumstances" bearing on that decision (*Keenan, supra*, 46 Cal.3d at p. 506), the prosecution may consider that the charges against the accused include other serious violent crimes against different victims.

Defendant implies that by telling defendant "it's my job to see that you're executed," Marlette revealed a disregard for his duty, as an officer of the

---

[12]The trial court suppressed defendant's statements to Marlette as a sanction for Marlette's violation of the rule against direct communication with an opposing party who is represented by counsel. (Rules Prof. Conduct, rule 2-100.)

court, to seek a just disposition. We disagree. Marlette sought only to caution defendant that an unrepresented conversation between them was not in defendant's best interest. And his remark merely acknowledged that the prosecution had indeed decided to seek the death penalty. We must, of course, presume that this decision was " 'legitimately founded on the complex considerations necessary for the effective and efficient administration of law enforcement. [Citation.]' " (*People* v. *Keenan, supra,* 46 Cal.3d at p. 506, quoting *People* v. *Haskett* (1982) 30 Cal.3d 841, 860 [180 Cal.Rptr. 640, 640 P.2d 776].)

Nor are we persuaded that Marlette's casual remark about an "instinctive" stabbing demonstrates bad faith in the prosecution's theory that defendant was death eligible because he intended to kill. The evidence supported an inference of intent to kill, and nothing in Marlette's comment was necessarily inconsistent with such a conclusion. In any event, the remark reflected at most the personal opinion of Marlette, who ultimately did not even try the case. The prosecution assured the trial court that all charging decisions were made by the district attorney himself, without regard to the conversation between defendant and Marlette. Defendant's claims must therefore be rejected.

### 3. *Wheeler Motion.*

Before the final jury was sworn, defense counsel interposed a so-called *"Wheeler* motion" alleging that the prosecutor had used peremptory challenges to exclude members of racial and ethnic minorities from the jury. (*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].) Counsel observed that, of the prosecutor's fifteen challenges, the first was exercised against Curmiller Barber, who was Black, the fourth against Trinidad Campos, who was Hispanic, the fifth against Mildred Staples, who was Black, the sixth against Susan Cox, who was Hispanic,[13] and the ninth against Lydia Nevarez, who was Hispanic. This pattern, counsel argued, demonstrated a "systematic" purpose of discrimination.

The court declared a brief recess so the prosecutor could "go get his notes and respond." When court reconvened, the prosecutor first observed that there were three Hispanic jurors, David Sanabria, Wanda Francisco, and Neal Navarro, one Black juror, Christine Wynn, and one Hispanic alternate, Rita Delgado. He also charged that the defense had dismissed Hispanic panelists Nancy Cano and Stacy Gonzales, Black panelist Homer Hyland,

---

[13]Cox was apparently this panelist's married name. In her jury questionnaire, she indicated she was registered to vote as Susan Rodriguez, and she identified her ethnic background as Mexican-American.

and Asian-American alternate panelist Eric Nakao.[14] On this basis, the prosecutor argued, defendant had not made out a prima facie case of "systematic" exclusion.

The court responded, "[w]ell, I have questions about their making a prima facie showing, but I want you to go on." At this point, opposing counsel engaged in another brief debate about defense dismissals and the composition of the existing jury. The court made no comment. The prosecutor then proceeded to explain his reasons for each excusal challenged by the defense. In doing so, he referred both to questionnaire responses and to voir dire answers given by each of the dismissed panelists.

At the conclusion of the prosecutor's presentation, the court denied the defense motion. The court ruled there was no "systematic exclusion" of minorities, "since we do have minorities on the existing jury." The court further found "that for the reasons . . . you've stated . . . [,] you were justified in exercising a peremptory challenge." Noting that both sides had dismissed minority panelists, the court found "that . . . all [such dismissals were] justified under the circumstances from the questions given." Finally, the court formally found that the existing jury comprised a representative cross-section of the community.

Before us, defendant renews his challenges to the prosecution's dismissal of panelists Barber, Campos, and Nevarez. The applicable principles are clear.

■ "The California Constitution forbids the use of peremptory challenges to discriminate against members of a 'cognizable' racial, religious, ethnic, or other identifiable group. ([*People* v.] *Wheeler, supra,* 22 Cal.3d 258.) The federal Constitution similarly proscribes discriminatory challenges on the basis of race. (*Powers* [v. *Ohio* (1991)] 499 U.S. 400 [113 L.Ed.2d 411, 111 S.Ct. 1364]; *Batson* [v. *Kentucky* (1986)] 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712].)" (*People* v. *Montiel* (1993) 5 Cal.4th 877, 909 [21 Cal.Rptr.2d 705, 855 P.2d 1277].)

One who believes his opponent is using peremptory challenges for improper discrimination must object in timely fashion and make a prima facie showing, i.e., demonstrate a strong likelihood that prospective jurors are

---

[14]The prosecutor's survey of accepted jurors was not entirely correct. In their jury questionnaires, both Sanabria and Navarro identified themselves as Hispanic, and Wynn identified herself as Black. However, despite her surname, Francisco identified herself as "German/ Irish" and "Caucasian." The prosecutor also understated the number of minority panelists dismissed by the defense. Besides Cano, Hyland, Gonzales, and Nakao, these included Robert Robertson, who identified himself as American Indian and Hispanic.

being excluded because of race or group association. (E.g., *People* v. *Davenport* (1995) 11 Cal.4th 1171, 1199-1200 [47 Cal.Rptr.2d 800, 906 P.2d 1068]; *People* v. *Crittenden* (1994) 9 Cal.4th 83, 115 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People* v. *Garceau, supra,* 6 Cal.4th 140, 170.) If the trial court finds a prima facie case, the burden shifts, and the party whose peremptory exclusions are under attack must then provide a race- or group-neutral explanation, related to the particular case, for each suspect excusal. (E.g., *People* v. *Turner* (1994) 8 Cal.4th 137, 164-165 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *People* v. *Fuentes* (1991) 54 Cal.3d 707, 714 [286 Cal.Rptr. 792, 818 P.2d 75].)

When the trial court solicits an explanation of the challenged excusals without first indicating its views on the prima facie issue, we may infer an implied prima facie finding. (*People* v. *Montiel, supra,* 5 Cal.4th 877, 910, fn. 8; *People* v. *Fuentes, supra,* 54 Cal.3d 707, 716-717; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1217 [255 Cal.Rptr. 569, 767 P.2d 1047]; see also *Hernandez* v. *New York* (1991) 500 U.S. 352, 359 [114 L.Ed.2d 395, 405-406, 111 S.Ct. 1859].) The court cannot undo an implied ruling once made by stating after explanations have been received that it never intended to find a prima facie case. (*Fuentes, supra,* 54 Cal.3d at p. 717.) Once an implied prima facie finding has been made, that issue becomes moot, and the only question remaining is whether the individual justifications were adequate. (*Montiel, supra,* 5 Cal.4th at p. 910, fn. 8; *Fuentes, supra,* 54 Cal.3d at p. 717; see *Hernandez, supra,* 500 U.S. at p. 359 [114 L.Ed.2d at pp. 405-406].)

Here, the trial court asked for individual explanations, but only after stating it had "questions" about the defense's prima facie showing. The court's expression of doubt negates any inference that it made an implied finding either way about the existence of a prima facie case. (See *People* v. *Davenport, supra,* 11 Cal.4th 1171, 1200-1201 [prima facie finding cannot be inferred, and prima facie issue is not moot, where court fails to interrupt prosecutor's immediate attempt to give individual explanations]; *People* v. *Turner, supra,* 8 Cal.4th 137, 166-167 [similar conclusion where trial court expressly found absence of prima facie showing, but then requested explanation in abundance of caution].)

For this reason, the record provides us with no ruling on that issue which we might examine for abuse of discretion. (Cf. *People* v. *Turner, supra,* 8 Cal.4th 137, 167; *People* v. *Fuentes, supra,* 54 Cal.3d 707, 716-717, fn. 5.) Therefore, despite our own substantial doubts that defendant made a prima

facie showing of discriminatory challenges by the prosecutor,[15] we bypass that question and proceed directly to a determination whether the court's ultimate acceptance of the prosecutor's justifications can be sustained.

We review such a determination with great restraint. The party seeking to justify a suspect excusal need only offer a genuine, reasonably specific, race- or group-neutral explanation related to the particular case being tried. (*People* v. *Fuentes, supra,* 54 Cal.3d 707, 718; *People* v. *Johnson, supra,* 47 Cal.3d 1194, 1216; *People* v. *Hall* (1983) 35 Cal.3d 161, 167-168 [197 Cal.Rptr. 71, 672 P.2d 854]; see *Batson* v. *Kentucky* (1986) 476 U.S. 79, 97-98, & fn. 20 [90 L.Ed.2d 69, 88-89, 106 S.Ct. 1712].) The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice. (*People* v. *Montiel, supra,* 5 Cal.4th 877, 910, fn. 9; *Johnson, supra,* 47 Cal.3d at p. 1218.)

"If the trial court makes a 'sincere and reasoned effort' to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. In such circumstances, an appellate court will not reassess good faith by conducting its own comparative juror analysis. Such an approach would undermine the trial court's credibility determinations and would discount ' "the variety of [subjective] factors and considerations," ' including 'prospective jurors' body language or manner of answering questions,' which legitimately inform a trial lawyer's decision to exercise peremptory challenges. [Citations.]" (*People* v. *Montiel, supra,* 5 Cal.4th 877, 909.)[16]

With these standards in mind, we conclude that the instant trial court's ruling satisfies *Wheeler/Batson* standards. Certain aspects of the trial court's findings were neither necessary nor relevant, since a *Wheeler* violation does not require "systematic" discrimination (*People* v. *Fuentes, supra,* 54 Cal.3d 707, 715-716, & fn. 4) and is not negated simply because both

---

[15]In arguing for a prima facie case, defendant merely indicated the number and order of minority excusals and compared the number of such excusals against the representation of such minority groups in the entire venire. We have suggested that this is not sufficient to establish a prima facie case of discriminatory exclusion, particularly where, as here, the final jury includes members of the same minority groups. (See *People* v. *Turner, supra,* 8 Cal.4th 137, 167-168.)

[16]Just as an appellate court will not compare the responses of rejected and accepted jurors to determine the bona fides of the justifications offered, so the trial court itself has no obligation to perform such an analysis. "[W]e fail to see how a trial judge can reasonably be expected to make such detailed comparisons mid-trial." (*People* v. *Johnson, supra,* 47 Cal.3d 1194, 1220.) Moreover, as we have indicated, such an analysis is largely beside the point, because it ignores the legitimate subjective concerns "that go into a lawyer's decision to select certain jurors while challenging others that appear to be similar [on the cold record]." (*Ibid.*)

sides have dismissed minority jurors or because the final jury is "representative." However, after observing the relevant voir dire examinations and hearing the prosecutor's extensive explanations, the court also found in effect that the reasons offered for each individual suspect excusal, including those of panelists Barber, Campos, and Nevarez, were both genuine and acceptably nondiscriminatory.[17]

The record discloses no basis for suspicion that the court's effort to evaluate the prosecutor's good faith in this regard was anything other than " 'sincere and reasoned.' " (*People* v. *Montiel, supra,* 5 Cal.4th 877, 909.) Hence, if the responses given by the individual excused panelists support the court's findings, we must accept them.

As to Barber, the prosecutor explained he had marked some 34 of her questionnaire responses for purposes of follow-up at voir dire, "not the least of which [were] in the death penalty area," but "[t]his was a woman who'd never thought of it [i.e., the death penalty]," and despite his efforts to elicit her views in his oral examination, she "could not articulate anything." Barber's verbal difficulties frustrated his efforts to get through all 34 of the suspect written responses, and he "did not consider her . . . a very bright woman." He further noted that Barber's daughter was currently being prosecuted by his office, that the daughter's public defender had admonished against discussing the case, and that Barber "even testified . . . as a witness for her daughter, presumably against the People." Finally, he expressed concern about the substance of Barber's expressed views on capital punishment, which suggested that she might not impose the death penalty against a robber who killed unexpectedly to make a getaway.

The prosecutor's expressed concerns about Barber's attitudes toward law enforcement and capital punishment are amply supported by the record. When asked in her questionnaire to describe her "general feelings regarding the death penalty," Barber responded, "I have never thought about it." When asked if her death penalty views had changed in the last few years, Barber responded, "None." When asked what types of cases deserved the death

---

[17]As will be recalled, the trial court found, among other things, "that for the reasons that you've stated that you were justified in exercising a peremptory challenge," and "that . . . all [excusals were] justified under the circumstances from the questions given." Citing *People* v. *Fuentes, supra,* 54 Cal.3d 707, defendant urges that the trial court's ruling was fatally incomplete because it failed to address every excused juror individually. *Fuentes* is distinguishable. There, the trial court upheld the excusal of several prospective jurors even though it concluded, in general terms, that some of the reasons given for their dismissal were true and some were false. Under those circumstances, we held, the court must determine that there were genuine reasons for each individual suspect excusal. (*Id.* at p. 720.) Here, by contrast, the court's ruling implied that it found all the reasons applicable to each juror to be true. Nothing more is required.

penalty, Barber responded, "Deliberate murder[,] planned murder for financial gain or to marry someone else." She also described her daughter's pending criminal charge.

On voir dire, Barber again stated she had never given much thought to capital punishment. Moreover, when responding to questions by defense counsel, she elaborated upon her view that the death penalty should be reserved for "deliberate" or "premeditated" murders. "I wouldn't say [it] was deliberate," she theorized, if someone went in to rob a bank, without "any intentions of killing anyone," but then fired back at a guard who was trying to prevent an escape. Barber also confirmed her daughter's criminal case, in which she had been called to testify as a character witness.

The hypothetical posed by Barber was uncomfortably similar to the facts of the Beacon homicide. Accordingly, the prosecutor could deduce that she might be an undesirable penalty juror in this case. He could also surmise that her daughter's adversary contact with the criminal justice system might make Barber unsympathetic to the prosecution. (See *People* v. *Turner, supra,* 8 Cal.4th 137, 171; *People* v. *Walker* (1988) 47 Cal.3d 605, 625-626 [253 Cal.Rptr. 863, 765 P.2d 70].) The record thus supports the conclusion that the excusal of Barber was proper.[18]

As to Campos, the prosecutor cited soft and reluctant responses and considerable ambivalence about capital punishment. The prosecutor suggested that Campos believed the death penalty discriminates against poor people, and that Campos questioned whether anyone has the right to decide whether another will die. Such views, the prosecutor asserted, might make Campos unduly susceptible to psychiatric and background defenses at the penalty phase.

Again, the prosecutor's reservations are supported by the record. In his jury questionnaire, Campos stated that while the death penalty was needed, "the justice system does not affect the rich and poor the same" and "discriminates between rich [and] poor due to unequal representation." At one point during voir dire, the prosecutor commented to Campos that "you're very hard to hear speaking. You're a very soft-spoken person." During the examination, Campos said he could handle the responsibilities of a penalty juror, but it would be "tough," and "[the] question, you know, comes across my mind as far as whether . . . we have the right to—to decide whether

---

[18]Indeed, the trial court made the following specific ruling as to Barber: "I am going to find you were justified in excusing Mrs. Barber from having reviewed what she stated here in court or having considered what she testified and her manner of testifying in answering the questions [and] that it was proper to excuse her for justification, regardless of what . . . her race was."

somebody else should die . . . ." Campos also explained his opinion that poverty works against one accused of crime because he may lack the resources necessary to protect his rights and present the best defense.

Such views, while unobjectionable in general society, could cause a prosecutor to suspect that Campos might be particularly reluctant to impose death, regardless of the evidence, and might readily accept a penalty defense based on an impoverished background. The prosecutor could also worry that Campos's soft-spoken demeanor signalled an inability to discuss or maintain his views during deliberations. The record thus supports the conclusion that Campos was properly excused.

As to Nevarez, the prosecutor connected her youth (age 25) to certain of her responses which, in the prosecutor's view, suggested her lack of involvement in society and apparent distrust of the system. For example, he observed, Nevarez had a child though never married, was not registered to vote, and had agreed the police should not be called when her boyfriend suffered thefts and burglaries. Further, the prosecutor suggested, her questionnaire responses indicated confusion about concepts of forensic psychiatry. Finally, citing specific portions of Nevarez's voir dire examination, he noted that she considered the responsibilities of a penalty juror "unfair" and had agreed, at one point, that her feelings about the death penalty might substantially impair her ability to render a death verdict, regardless of the evidence. He indicated that, after reading Nevarez's questionnaire answers, he had rated her a "one," his lowest category.

The record confirms Nevarez's age, her marital and parental status, her failure to register as a voter, and her response to the crimes against her boyfriend. It also bears out other concerns cited by the prosecutor.

Thus, when asked in the questionnaire whether she understood she was not bound to accept the opinions of a psychiatrist or psychologist as conclusive, she responded, "I do not understand." On voir dire, Nevarez largely explained away this answer by indicating she now understood. She also retracted, as the result of misunderstanding, her initial voir dire statement that her death penalty views might hamper her abilities, and she insisted that "I'm for the death penalty." However, she adhered to her view that the burden of deciding whether to impose that penalty was "unfair." Nevarez denied that this feeling would influence her decision, but the prosecutor had reason not to want a juror resentful of the personal obligation to consider a capital verdict.

Under all the circumstances, the record substantially supports the trial court's conclusion that Nevarez, like Barber and Campos, was properly excused. Accordingly, defendant's *Wheeler* claim must fail.

#### 4. *Denial of Separate Guilt, Enhancement, and Penalty Juries.*

In a pretrial motion, and again prior to the penalty phase, defendant sought empanelment of a separate jury to hear penalty issues. At the conclusion of the guilt trial, defendant also moved for a separate jury to hear the enhancement allegation that he had suffered a previous conviction. All these motions were denied.

Defendant claims these rulings violated his rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, because a jury which has already adjudicated the issue of guilt cannot fairly evaluate uncharged criminal conduct introduced at the enhancement and penalty phases. We have repeatedly rejected such contentions (e.g., *People* v. *Espinoza* (1992) 3 Cal.4th 806, 827 [12 Cal.Rptr.2d 682, 838 P.2d 204]; *People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 135-136 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People* v. *Balderas, supra*, 41 Cal.3d 144, 204-205, & fn. 32), and defendant presents no persuasive reason to reconsider. We therefore decline to do so.

#### B. *Issues at Guilt Trial.*

#### 1. *Instructional Issues.*

#### a. *CALJIC No. 17.02.*

Defendant requested CALJIC No. 17.02, which instructs in cases involving multiple counts that each must be decided distinctly and separately, and that the defendant may be found guilty or not guilty of any or all charges.[19] Defendant claims the trial court erred when, after agreeing to give this instruction, it inadvertently failed to do so. However, the reporter's transcript indicates that the instruction was given.

#### b. *Cautionary Other-crimes Instruction.*

Defendant makes the related claim that his counsel was ineffective for failing to request an instruction that a guilty verdict on one or more of the joined charges could not be considered as proof that he is a person of bad character or criminal disposition and thus committed the other charged crimes. However, the case law suggests that such a limiting instruction is not

---

[19]CALJIC No. 17.02 reads: "Each count charges a distinct crime. You must decide each count separately. The defendant may be found guilty or not guilty of [any or all] . . . of the crimes charged. Your finding as to each count must be stated in a separate verdict." The instruction actually given substituted "offense" for "crime," and "offenses" for "crimes."

necessary or proper in a case where charges are properly joined, particularly where, as here, CALJIC No. 17.02 was given. (See *People* v. *Kegler* (1987) 197 Cal.App.3d 72, 81-82 [242 Cal.Rptr. 897]; *People* v. *Thornton* (1979) 88 Cal.App.3d 795, 804 [152 Cal.Rptr. 77]; *People* v. *Jackson* (1975) 45 Cal.App.3d 67, 70 [119 Cal.Rptr. 71].) The claim of ineffective assistance of counsel lacks merit.

 c. *CALJIC No. 2.03.*

■ Defendant claims the trial court erred in giving CALJIC No. 2.03, which instructs that if the accused made a willfully false or deliberately misleading pretrial statement about the charged offenses, such statement may be considered as tending to show consciousness of guilt but cannot alone prove guilt.[20] We have consistently upheld the giving of this instruction where it is supported by evidence. (*People* v. *Turner*, *supra*, 8 Cal.4th 137, 202; *People* v. *Kelly* (1992) 1 Cal.4th 495, 531 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

The prosecutor sought the instruction on the basis of defendant's statements to his mother, Adeline Rodriguez, that he did not mean to stab anyone at the Beacon store but became startled and acted reflexively when someone put a hand on his shoulder. These statements, the prosecutor urged, were contrary to the testimony of eyewitness Galvin that victim Waltrip did not touch defendant, but that *defendant* put his hand on *Waltrip's* shoulder and pulled Waltrip toward him before stabbing him.

Defendant urges there is no evidence his statements to Rodriguez about the way the stabbing occurred were fabrications. As the People suggest, however, in light of the contrast between eyewitness accounts which suggested a deliberate action, and defendant's claim of mere reflex, a jury could reasonably infer that the statements were self-serving falsehoods intended to cast his conduct in the least culpable light. (See *People* v. *Green* (1980) 27 Cal.3d 1, 40-41 [164 Cal.Rptr. 1, 609 P.2d 468] [instruction proper where only evidence of statement's falsehood is its inconsistency with prosecution case at trial].) That defendant also expressed remorse to Rodriguez does not negate such an inference, since the jury could conclude that such expressions were also self-serving and insincere.

---

[20]CALJIC No. 2.03, as insubstantially modified by the instant trial court, instructed: "If you find that before this trial the defendant made a willfully . . . false or deliberately misleading statement concerning the crimes for which he is, now, on trial[,] [y]ou may consider such statement as a circumstance tending to prove a consciousness of guilt. [¶] However, such conduct is not sufficient, by itself, to prove guilt and its weight and significance, if any, are matters for your determination."

Defendant nonetheless claims the jurors should at least have been told that CALJIC No. 2.03 did not permit them to use defendant's statements against him on the issue of intent to kill. For two reasons, the claim lacks merit.

First, defendant's statements to Rodriguez were, in effect, attempts to deny that he intended to kill Waltrip. If the jury found these statements were lies, they would logically suggest that defendant did intend to kill, and that he harbored a consciousness of that fact.

Second, the instruction told the jury only that pretrial lies may bear on "consciousness of *guilt*" (italics added); a reasonable jury would understand this phrase to mean only "consciousness of some wrongdoing," not consciousness of each and every element of the charged offense. (*People* v. *Crandell* (1988) 46 Cal.3d 833, 871 [251 Cal.Rptr. 227, 760 P.2d 423].) "The instruction[] [does] not address the defendant's mental state at the time of the offense and [does] not direct or compel the drawing of impermissible inferences in regard thereto." (*Ibid.*; accord, *People* v. *Breaux* (1991) 1 Cal.4th 281, 304 [3 Cal.Rptr.2d 81, 821 P.2d 585]; *People* v. *Nicolaus* (1991) 54 Cal.3d 551, 579-580 [286 Cal.Rptr. 628, 817 P.2d 893].) Hence, no clarifying instruction was necessary.

Defendant contends that CALJIC No. 2.03 is an improper "pinpoint" instruction. (See *People* v. *Wright* (1988) 45 Cal.3d 1126 [248 Cal.Rptr. 600, 755 P.2d 1049].) We recently rejected the identical contention. As we explained, "CALJIC No. 2.03 . . . does not merely pinpoint evidence the jury may consider. It tells the jury it may consider the evidence *but it is not sufficient by itself to prove guilt.* [Citation.] . . . If the court tells the jury that certain evidence is not alone sufficient to convict, it must necessarily inform the jury, either expressly or impliedly, that it may at least consider the evidence. Nothing in *Wright* affects such an instruction. There was no error." (*People* v. *Kelly, supra,* 1 Cal.4th 495, 531-532, italics in original.)

### d. *Failure to Give Accomplice Instructions.*

Defendant contends that prosecution witness James Valdez was, or at least may have been, an accomplice in the Beacon robbery. Hence, defendant urges, the trial court erred by failing, sua sponte, to instruct the jury on the law of accomplices, including the requirements that an accomplice's testimony must be corroborated and should be viewed with distrust. (§ 1111; CALJIC Nos. 3.11, 3.18.)

For instructional purposes, an accomplice is a person "who is liable to prosecution for the identical offense charged against the defendant on trial

in the cause in which the testimony of the accomplice is given." (§ 1111; *People* v. *Sully, supra,* 53 Cal.3d 1195, 1227; *People* v. *Miranda* (1987) 44 Cal.3d 57, 99 [241 Cal.Rptr. 594, 744 P.2d 1127].)　　Defendant suggests that Valdez was implicated in the robbery murder insofar as he created a diversion by stealing beer, then drove the getaway car.

The evidence indicates that Valdez had no advance knowledge of the robbery, did not intend his beer stealing as a robbery diversion, and had left the store, still ignorant of defendant's intentions, before the robbery began. On the other hand, the robbery may have been a reasonably foreseeable consequence of the agreed plan to steal merchandise from the store, and Valdez did help defendant transport robbery proceeds away from the scene. These are arguable grounds for charging Valdez, as an aider and abettor, with both the robbery and the attendant felony murder of Waltrip. (See, e.g., *People* v. *Montoya* (1991) 7 Cal.4th 1027, 1040-1041, 1044 [31 Cal.Rptr.2d 128, 874 P.2d 903].)

However, we need not resolve whether the failure to give accomplice instructions under these circumstances was error. The omission of such instructions, even if erroneous, is deemed harmless where there was ample evidence corroborating the witness's testimony. (*People* v. *Sully, supra,* 53 Cal.3d 1195, 1228; *People* v. *Miranda, supra,* 44 Cal.3d 57, 100.) Valdez's testimony about defendant's perpetration of the Beacon robbery murder was amply corroborated by the eyewitness identifications of Lawrence Galvin and Edgar Calderon, by Sonya White's testimony that defendant admitted the robbery, and by defendant's threat to Victor Trejo that he had already made a "movita" on someone else that night. Defendant thus suffered no prejudice.

For similar reasons, there is no merit to defendant's claim that the failure to give accomplice instructions violated his right to due process under the Fourteenth Amendment of the United States Constitution. No basis for reversal appears.

　　2.　*Right of Absence From Trial; Prejudicial Effect of Defendant's Outburst.*

Defendant urges that his Sixth and Fourteenth Amendment rights to a fair trial, and to an impartial jury, were violated when the trial court erroneously refused his request to be absent from the trial, thus forcing him to engage in disruptive behavior and display his courtroom restraints while the jury was present. We find no error and no cognizable prejudice.

The relevant facts are as follows: Pursuant to the court's usual policy, defendant was restrained when in the courtroom by handcuffs, and by a

chain, not visible to the jury, which fit around his waist and attached to the counsel table. On several occasions both before and during trial, defendant had been disruptive in open court, interjecting protests about his lawyers' performance or the proceedings in general.

During a recess on the morning of November 2, 1989, defense counsel announced that defendant believed the prosecution was engaging in "gamesmanship" by calling surprise witnesses. According to counsel, "[defendant] does not want to be a part of it" and was asking to be excused. After satisfying itself that the defense had received proper discovery, the court said, "let's proceed." Defendant raised no objection. The prosecution then presented witness Linda McCord. The lunch recess was called at the completion of McCord's direct testimony.

At the commencement of the afternoon session, defense counsel advised the court, outside the jury's presence, that defendant believed the trial was unfair, no longer wished to be present, and had threatened disruption if forced to remain. A three-way conversation ensued among court, counsel, and defendant. The court explained that it read the cases to require defendant's nonwaivable presence at all stages of a capital trial. Defendant indicated that the court's insistence on his continued presence made him feel "boxed in a corner" and "might" make him do something he would "regret."

Ultimately, the court decided that "we're going to continue [i.e., proceed with] the trial *this afternoon*. I will give you an opportunity to renew your request *in the morning* with some citations that would allow me to proceed in [defendant's] absence. . . ." (Italics added.) The court expressed a desire to finish with the current witnesses and asked defendant to cooperate for the rest of the afternoon because "[w]e've only got a couple of hours to go."

Later that afternoon, during the examination of witness Steven Spillmer, the court called a 15-minute recess. Outside the jury's presence, the court noted that for about 30 minutes, there had been a sound like handcuffs clicking together, and that a juror had complained. At the bailiff's suggestion, the court ordered defendant's handcuffs to be double-locked. The court warned that while it wished to avoid shackling, it would resort to that measure if necessary. Defendant responded that "[i]f you don't shackle me up, now, you'll have to do it later on. So I'd like to be shackled in front of the jury."

The court extended the jury recess, during which defendant was apparently taken "downstairs" to use the restroom. When he returned, the court observed, outside the jury's presence, that he had torn off his overshirt, but

did have an undershirt on, at which point defendant quipped, "Temporarily." Defense counsel pointed out that defendant had also torn open his pants, leaving his undershorts exposed. Counsel moved for a continuance on grounds of defendant's disheveled appearance. The prosecutor objected, asking that the current witness, at least, be completed. The court agreed, noting that defendant could be seated close to the counsel table so his torn pants would not be visible to the jury.

The jury was recalled, and the examination of Spillmer continued. Defendant interrupted with a request that he be excused from the proceedings. The court denied the request. The following colloquy then occurred in the jury's presence:

"THE DEFENDANT: Excuse me, [y]our Honor, but I'm trying to tell you I'd like to be excused. I been trying to tell you that all this afternoon, so if you don't mind— [¶] THE COURT: I will indicate to you, Mr. Arias, that if you continue your disruptive behavior— [¶] THE DEFENDANT: That's what I been trying to tell you. I know what you're trying to tell me, and that's what I have been asking. [¶] THE COURT: Just sit down and be quiet. You are already sitting down. Just be quiet. [¶] THE DEFENDANT: Well, I got no choice. I have got this chain around my stomach. [¶] THE COURT: There will be more chains to you tomorrow if— [¶] THE DEFENDANT: That's good. Whatever it takes. [¶] I'd like to be excused. [¶] THE COURT: Just be quiet. [¶] THE DEFENDANT: I'd like to be excused from these proceedings, if you don't mind. [¶] THE COURT: I indicated to you no.

"THE DEFENDANT: This is—I tell you I want to be excused, and you give me no other choice, but to disrupt the courtroom. And I'm trying to express to you I'm facing a death penalty case, and I'd like to be excused for a moment so I can get myself composed. [¶] Excuse me, [y]our Honor. [¶] THE COURT: Would you pull him around from the table. [¶] THE DEFENDANT: I'm trying to tell you, I'd like to be excused, if you don't mind. [¶] THE COURT [to the prosecutor]: Go ahead. [¶] . . . [¶] THE DEFENDANT: Excuse me, [y]our Honor. Trying to tell you, right now, I'd like to be excused from the courtroom. [¶] THE COURT: I will tell you, Mr. Arias, if you continue acting this way, you will have a gag in your mouth. [¶] THE DEFENDANT: Well, gag me if you want to. But I'd like to be excused from the courtroom."

At this point, the court called the evening recess and excused the jury. The court noted for the record that defendant had torn off his T-shirt and removed his pants and shoes, and had been knocking his chains on the counsel table. The court warned defendant again that if a similar disruption occurred the next day, he would be further chained and gagged.

Defense counsel protested that defendant could not appear before the jury in such a fashion. Counsel suggested defendant be allowed to observe the proceedings on closed-circuit television in an adjoining room. The court indicated there were no adjoining rooms, and it was aware of no procedure for closed-circuit television. Furthermore, the court observed, "we can't put Mr. Arias in a position of running the courtroom." The court announced that the trial would proceed in the morning and asked the sheriff to be prepared "with appropriate chains, and, if necessary, a gag." Defendant responded, "Well, tell you what. It will be necessary, and we'll deal with it on appeals, if that's what it takes. It don't bother me."

At the beginning of the next day's session, the court spoke to the jury about "the problems" that arose "yesterday." The court admonished "that you are to consider this case only on the evidence that comes from the witness stand here and make your decision based on that evidence, and not what you observed in the courtroom, the acts or antics of the defendant. [¶] You're to ignore these actions in making your decision and base it solely on the evidence that comes from the witness stand."

The court then excused the jury to take up defendant's absence request, as it had promised to do. The court explained that defendant had an absolute right to be present during evidentiary proceedings, but that under *People* v. *Robertson* (1989) 48 Cal.3d 18 [255 Cal.Rptr. 631, 767 P.2d 1109] (then recently decided), he could make a knowing and voluntary waiver of that right. The court ruled it would excuse defendant from each day's proceedings if, for each such day, defendant executed a separate written waiver of his right to be present.

Defendant agreed to this procedure. Outside the jury's presence, he executed a waiver for the afternoon session of November 3, 1989, and was thereupon excused for that day. When the jurors were recalled, the court advised them that defendant had exercised his right to be absent and instructed that this should not affect their deliberations. The court again admonished that "the things that you've heard or the antics you've heard up to this point you're to ignore, and that's not to influence your decision whatsoever."

Defendant thereafter executed waivers for several additional days. However, he eventually returned to the courtroom and was present throughout the remainder of the guilt trial.

Based on the events of November 2, defendant moved for a mistrial. He also sought permission to question the jurors in camera about the effects of these events. These motions were denied.

 Defendant first argues that the trial court erred under *People* v. *Robertson*, *supra*, 48 Cal.3d 18, when it did not immediately grant, upon appropriate waiver, his request to be excused. The error was prejudicial, defendant urges, because it created the very dilemma which influenced this court in *Robertson* to recognize an orderly waiver of the constitutional and statutory right of trial presence. That is, the court's ruling forced defendant to disrupt the courtroom in order to accomplish his removal. According to defendant, both his disruptive behavior, and the consequence that it revealed his waist chain and handcuffs to the jury, prejudicially undermined his case.

 We have held that the constitutional and statutory right to be present at "critical stages" of the trial can be formally waived, at least where our statutes do not provide otherwise. (*People* v. *Edwards* (1991) 54 Cal.3d 787, 809-810 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People* v. *Robertson*, *supra*, 48 Cal.3d 18, 59-62; see also *People* v. *Price* (1991) 1 Cal.4th 324, 405-406 [3 Cal.Rptr.2d 106, 821 P.2d 610]; but see § 977, subd. (b).) We noted in *Robertson* that disruptive conduct which forces the accused's removal from the courtroom had already been recognized as a waiver of the right to be present. (*Robertson*, *supra*, at p. 60, citing *Illinois* v. *Allen* (1970) 397 U.S. 337, 343 [25 L.Ed.2d 353, 358-359, 90 S.Ct. 1057]; see also § 1043, subds. (b)(1), (c).) It would be anomalous, we reasoned, if the right could not also be waived by more peaceable means. "To hold otherwise . . . would force a defendant into 'the untenable position of having to disrupt the courtroom to such an extreme as to result in his removal, thereby seriously prejudicing his case.' [Citations.]" (*Robertson*, *supra*, 48 Cal.3d at p. 61, quoting *Peede* v. *State* (Fla. 1985) 474 So.2d 808, 815.)

 But the trial court in this case imposed no such dilemma upon defendant. Believing that the waiver-of-presence issue justified briefing and argument, the court merely sought to delay a hearing and ruling on this matter for the remainder of the court day. This would allow the examination of scheduled witnesses to be completed, and would also allow defense counsel time to gather their authorities and prepare a coherent argument.[21] The court promised defendant and his counsel that it would hear the waiver matter promptly upon resumption of court the next day, and it asked for defendant's indulgence and cooperation in the meantime.

In so doing, the court merely exercised its inherent power to control and order the proceedings. Nothing in our cases required the court to suspend the

---

[21]The trial court's cautious approach was hardly unreasonable. Prior to *People* v. *Robertson*, *supra*, 48 Cal.3d 18, a case then less than 10 months old, the question whether the constitutional right to be present at trial could ever be voluntarily waived was "open." (*Id.* at p. 60; see *Drope* v. *Missouri* (1975) 420 U.S. 162, 182 [43 L.Ed.2d 103, 119, 95 S.Ct. 896].)

trial instantly in order to consider and grant defendant's impulsive demand, unsupported by any recitation of authority, that he be excused. We find no abuse of discretion in the trial court's decision to postpone the waiver matter for this relatively brief period.

Moreover, *People* v. *Robertson*, *supra*, 48 Cal.3d 18, does not stand for the proposition that a defendant may obtain reversal of his conviction by responding disruptively when the trial court declines to grant his absence request on the spot. It is well established that the accused shall not benefit on appeal from his own misconduct before the jury. (E.g., *People* v. *Williams* (1988) 44 Cal.3d 1127, 1156 [245 Cal.Rptr. 635, 751 P.2d 901].) When the accused "voluntarily [chooses] to protest the court's order [requiring his presence] [by acting] in [a disruptive] manner[,] [he] is estopped from complaining on appeal about his conduct." (*People* v. *Pride* (1992) 3 Cal.4th 195, 253-254 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

Defendant claims the court violated his Sixth Amendment rights to an impartial jury and a fair trial when it denied counsel's request for a voir dire examination of the jurors to determine the effects of his outburst. The court further erred, he posits, by failing sua sponte to instruct the jury to disregard his handcuffs and waist chain. (Citing *People* v. *Duran* (1976) 16 Cal.3d 282, 290-292 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1] [sua sponte admonition required when security concerns necessitate visible restraints].)

We disagree. Because the court saw exactly what the jurors saw, it was in a position to assess the probable effect on their ability to perform their duties. Hence, the court did not abuse its discretion by disallowing individual voir dire examination. (See *People* v. *Beeler* (1995) 9 Cal.4th 953, 989 [39 Cal.Rptr.2d 607, 891 P.2d 153].) Moreover, the court promptly and carefully admonished the jurors on two occasions to disregard everything they saw and heard in connection with defendant's outburst, and to decide the case solely on the trial evidence. These warnings were broad enough to cover both defendant's misbehavior and the shackles thereby made visible. We must assume the jury followed the court's admonitions. (E.g., *People* v. *Frank* (1990) 51 Cal.3d 718, 728 [274 Cal.Rptr. 372, 798 P.2d 1215].) No further action was necessary. No basis for reversal appears.

3. *Evidentiary Issues.*

a. *"Double Hearsay" Testimony of Linda McCord.*

Linda McCord was called as a witness before Judy N. had testified. As will be recalled, McCord stated that in the immediate aftermath of the Judy

N. incident, she and a visibly upset Ms. N. conversed while they were waiting to be interviewed by the police. Over defense objections, McCord was allowed to testify that during their conversation, Ms. N. told her defendant had said, "Haven't you been reading about me in the papers? I'm the man who killed the man in the Beacon Gas Station." On appeal, defendant raises several arguments against the admission of this testimony. None has merit.

The pertinent background is as follows: When the prosecutor asked McCord to tell what Ms. N. had said to her, defense counsel objected on hearsay grounds. The prosecutor responded that the statement was offered as a spontaneous declaration. The jury was excused, and an *in limine* hearing ensued. Defense counsel said he assumed McCord's description of Ms. N.'s statement would be "something along the lines that [Ms. N.] was very frightened, she was afraid the person was going to shoot her and the person had a gun." On this basis, counsel argued that the existence and truth of any such statements should be elicited from Ms. N. herself. He also asserted that McCord's testimony would merely be cumulative, and should therefore be excluded under Evidence Code section 352.[22]

The prosecutor responded with the cryptic remark, "As I indicated to counsel, I just found out about this." He denied that McCord's testimony would be cumulative, since Ms. N. herself had not yet testified. He also argued that admission of a spontaneous declaration did not depend on whether the declarant herself confirmed the declaration on the stand. But he never identified on the record what he had "just found out about," nor did he contradict defense counsel's stated assumption about what McCord would testify.

The court ruled that Ms. N.'s statement to McCord was admissible as a spontaneous declaration. It also indicated that "I can't make a ruling under [Evidence Code section] 352 that this is cumulative, since this is the first witness who's testified, so I can't make the ruling that it's an undue consumption of time. . . . So I think your motion is premature under 352. So the motion is denied."

Defendant first contends that McCord's testimony was "double hearsay" not subject to any hearsay exception. ■■■ As defendant notes, multiple hearsay is admissible for its truth only if each hearsay layer separately meets the requirements of a hearsay exception. (Evid. Code, §§ 1200, 1201.)

---

[22]Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Defendant complains that although the court ruled Judy N.'s statement to McCord admissible as a spontaneous declaration, the court made no separate finding about the admissibility of defendant's statement to Ms. N. However, during the *in limine* hearing, defendant's counsel disputed only the admissibility of Ms. N.'s statement to McCord. Counsel never asserted that defendant's statement to Ms. N. was inadmissible hearsay. Any such claim was therefore waived. In any event, defendant's statement was clearly admissible under the exception for admissions by a party (Evid. Code, § 1220), and he makes no contrary argument on appeal.

■■■ Defendant's principal contention is that Ms. N.'s statement about defendant's claim to be the Beacon killer could not be admitted as a spontaneous declaration, because it did not "[purport] to narrate, describe, or explain an act, condition, or event *perceived by the declarant.*" (Evid. Code, § 1240, subd. (a), italics added.) Defendant posits that Ms. N. was not a percipient witness to the Beacon robbery/murder and therefore was not spontaneously recounting an incident she had observed in person.

The argument lacks merit. Ms. N. was describing an "act" or "event," i.e., defendant's incriminating statement, which she personally perceived during the course of the kidnapping, robbery, and sexual assaults to which he had just subjected her. One may infer that defendant's boast was used to threaten and control Ms. N. during her ordeal. Nothing in the words or purpose of the "spontaneous declaration" exception makes it inapplicable when the "act" or "event" perceived and recounted is a statement implicating its declarant in another crime.

Defendant suggests Ms. N.'s statement to McCord lacks indicia of reliability because Ms. N. herself neither testified nor told anyone else that defendant specifically claimed to be the Beacon murderer. ■■■ However, if a hearsay statement meets the requirements of spontaneity and lack of opportunity for reflection (see, e.g., *People* v. *Farmer* (1989) 47 Cal.3d 888, 903 [254 Cal.Rptr. 508, 765 P.2d 940]), it does not become inadmissible because the declarant failed to mention, recall, or confirm it on later or calmer occasions. A spontaneous declaration is admissible, despite its character as hearsay, because of its particular reliability as the immediate product of direct perception, before fading memory or the opportunity for fabrication has intervened. ■■■ Of course, where the spontaneous declarant is available as a witness, as Ms. N. was, the existence and truth of the declaration may be explored in an examination under oath.

Defendant next asserts that the trial court violated its duty to explicitly weigh the merits of his Evidence Code section 352 objection. (Citing, inter

alia, *People* v. *Armendariz* (1984) 37 Cal.3d 573, 588-589 [209 Cal.Rptr. 664, 693 P.2d 243].) However, in the *in limine* hearing, defense counsel had argued only that McCord's hearsay report of her conversation with Judy N. would be cumulative to Ms. N.'s own testimony. As the court indicated, it could not evaluate that claim until it knew what Ms. N. would testify. By stating that the motion under Evidence Code section 352 was thus "premature," the court made clear that it could be renewed at an appropriate time. In so concluding, the trial court committed no abuse of discretion. Indeed, the motion was never renewed, and subsequent developments indicated that the McCord testimony was not cumulative. Defendant's claim must therefore fail.

 Finally, defendant urges the prosecutor committed misconduct, and misused witness McCord's testimony, because he misled defense counsel about what that testimony would be. Defendant argues that even if the prosecutor had "just found out" McCord would give testimony implicating him in the Beacon murder, the prosecutor committed misconduct by deliberately failing to disclose this development during the *in limine* hearing when defense counsel's remarks indicated counsel was unaware of it. We see no basis for reversal.

 At the outset, defense counsel's failure to timely seek appropriate sanctions for prosecutorial misconduct, or a continuance on grounds of unfair surprise, is fatal to a direct claim of error on appeal. (Cf. *People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1153 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People* v. *Price, supra*, 1 Cal.4th 324, 447.) Moreover, we cannot conclude that counsel's omissions undermine confidence in the trial outcome. (See *Strickland* v. *Washington* (1984) 466 U.S. 668, 694-695 [80 L.Ed.2d 674, 697-698, 104 S.Ct. 2052].)

In the first place, the record fails to establish deception or unfair surprise. By remarking, during the *in limine* hearing, that "[a]s I indicated to counsel, I just found out about *this*" (italics added), the prosecutor implied that he *had* advised defense counsel, *off the record*, about any new information McCord would supply. Counsel did not dispute the suggestion that the prosecutor had "indicated" to him whatever the prosecutor had "just found out." The impression that counsel was not actually surprised is reinforced by his inaction when the prosecutor later elicited McCord's incriminating testimony.

In any event, there appears no cognizable prejudice. That McCord would testify defendant told Ms. N. he was the Beacon killer made McCord's testimony no less admissible on its merits. In fact, to the extent McCord's

"Beacon killer" testimony would not duplicate testimony given by Ms. N. herself, it was even less vulnerable to the defense's trial argument that it was merely cumulative. Because counsel sought no continuance and also failed to cross-examine McCord, a claim that any surprise enhanced the damaging effect of her testimony is speculative.

Most fundamentally, the remaining evidence that defendant was the person who robbed the Beacon store and killed John Waltrip was overwhelming. Hence, there is no reasonable probability that if McCord's testimony on this subject had been excluded or effectively attacked on cross-examination, the result of the proceeding would have been different. (*Strickland* v. *Washington*, *supra*, 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698].)

b. *Adeline Rodriguez Testimony.*

Defendant raises several issues concerning the testimony of defendant's mother, Adeline Rodriguez, who was called as a prosecution witness. He first urges that the court erred in admitting, over his numerous hearsay objections, the testimony of Detective Stan Reed concerning Reed's earlier interview of Rodriguez. The interview evidence was allowed for its truth as prior inconsistent statements of Rodriguez. (Evid. Code, §§ 770, 1235.) Defendant asserts that Rodriguez's police interview was not materially inconsistent with her trial testimony. We agree that the bulk of the interview evidence should not have been admitted, but we find the error harmless.

Both Rodriguez's trial testimony and her earlier interview with Reed primarily concerned her conversation with defendant which took place in a park a few days after the Beacon robbery and murder. Rodriguez was obviously a reluctant witness, and her trial testimony was peppered with protestations that she had no clear recall of her conversations with defendant or the police. When the trial court concludes, on substantial evidence, that such professed lapses of memory are false, evasive devices to avoid truthful answers, it may admit, as "inconsistent," the witness's prior statements describing the events the witness now claims to have forgotten. (*People* v. *Green* (1971) 3 Cal.3d 981, 988-989 [92 Cal.Rptr. 494, 479 P.2d 998].)

However, despite her frequent evasiveness and assertions of memory loss, Rodriguez did ultimately recount her current recollection of her conversation with defendant. In effect, she conceded on the stand that defendant had admitted his participation in the Beacon robbery, had acknowledged stabbing someone who grabbed his shoulder and tried to restrain him, had disclosed the presence of a companion who did nothing but take some beer,

was reluctant to turn himself in because he did not want to go to prison, and had discussed becoming a fugitive. Rodriguez also testified she warned defendant against fleeing because the police would be looking for her car, which defendant had used in the Beacon crimes.

Rodriguez's prior interview statements, as recounted by Reed, were largely consistent with this testimony and included only one significant difference. Two examples illustrate the typical disparities. On the stand, Rodriguez was asked whether she told the police defendant had said he intended to go to Mexico. Rodriguez responded that while defendant had discussed flight, he never mentioned Mexico specifically, and she only assumed he would go there because he had relatives in that country. Reed later testified Rodriguez had said defendant told her "[t]hat he was going to go to Mexico." On the stand, Rodriguez could not recall that defendant had provided information about who was present in the Beacon store. Reed later testified Rodriguez had said defendant told her "a lady" was present.

Thus, in great measure, Rodriguez's trial testimony was not materially inconsistent with her prior statements. To that extent, admission of the prior statements for their truth under Evidence Code section 1235 was erroneous. (See *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1220 [14 Cal.Rptr.2d 702, 842 P.2d 1].) But by the same token, the error was harmless. Insofar as Reed's testimony did not materially differ from Rodriguez's, and thus should not have been admitted, it was merely cumulative. Hence, it is not reasonably probable that such erroneous admission affected the verdict. (*People* v. *Johnson, supra,* 3 Cal.4th 1183, 1220; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

There was, as previously indicated, one significant divergence between the Reed and Rodriguez accounts. When asked on the stand whether defendant had said he would die in prison or "end up *killing somebody else*" (italics added), Rodriguez responded, "I don't remember the exact words. But I know that [defendant] would *die* in—in prison, or anybody would *die* in prison, if they had to spend the rest of their life." (Italics added.) By contrast, Reed testified that Rodriguez previously said defendant had told her he "would end up *killing* someone" (italics added) if he was sent to prison. To the extent that Rodriguez, in her sworn testimony, denied or avoided admitting defendant had made this remark, her prior statement to Reed was materially inconsistent, and Reed's disclosure was therefore not subject to a hearsay objection.

However, defendant makes a separate argument that evidence he predicted he would kill in prison should have been excluded as irrelevant "character"

or "disposition" evidence under Evidence Code section 1101, and as more prejudicial than probative under Evidence Code section 352. He concedes he made no objections on these grounds but asks that we consider the merits as a claim of ineffective trial assistance.

Addressed in that context, defendant's contentions must nonetheless fail. Even if his "kill in prison" remark should have been excluded, upon proper objection, for the reasons now asserted, the failure to exclude it does not undermine confidence in the trial outcome. (*Strickland* v. *Washington, supra,* 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698].) Given the undisputed violence of his crimes against victims Waltrip and Judy N., this brief further reference to his propensity for violence could hardly have prejudiced the jury further.

Defendant suggests the jury may improperly have believed that, by showing his future readiness to kill, the remark was probative on the crucial issue of his intent to kill Waltrip. Again, we see no reasonable probability the judgment was affected. As noted above, Reed's testimonial reference to the remark was brief. The prosecutor's argument did not suggest the "kill in prison" comment was evidence that the murder of Waltrip was intentional; indeed, the prosecutor did not mention the remark at all.

Moreover, if the jurors were inclined to reason as defendant fears, his threats to Judy N. that he had killed before and would kill again already provided an ample basis. Those threats were properly in evidence, and any further damage caused by the "kill in prison" comment was marginal at most. No basis for reversal appears.

Defendant next attacks a particular line of questions posed to Rodriguez by the prosecutor. The prosecutor asked Rodriguez whether, while defendant was living at the Lemon Hill house, she warned defendant about "carrying" knives. Rodriguez said she had "warned them all," meaning "all [her] boys" including defendant, and she had "warned him too." The prosecutor then asked, "Why did you warn [defendant] not to carry knives?" At this point, defense counsel objected. When the court asked the basis of the objection, counsel replied, "Irrelevant as to all of them." The court indicated that the objection was overruled "as to [defendant]." Counsel said, "Well, then, under [Evidence Code section] 352." The court stated, "Denied." The prosecutor repeated his question, and Rodriguez answered, "Him and all his brothers, because I didn't want them getting into trouble."

In his reply brief, defendant renews his claim that the evidence was irrelevant. We disagree. The fact that defendant carried, brandished, and

used such a lethal weapon in the Beacon robbery is some evidence that he "considered the possibility of homicide from the outset." (*People* v. *Alcala* (1984) 36 Cal.3d 604, 626 [205 Cal.Rptr. 775, 685 P.2d 1126]; see also *People* v. *Haskett, supra*, 30 Cal.3d 841, 850.) That he did so despite recent[23] warnings against the carrying of knives heightens the inference of lethal purpose. This, in turn, supports the prosecution's theory that the fatal stabbing of Waltrip was not a spur-of-the-moment reflex, but a purposefully homicidal act.

Defendant also urges the court erred in overruling the objection under Evidence Code section 352. We disagree. Any "undue" prejudice from the inference that defendant carried a knife despite warnings was outweighed by the value of the evidence to prove that, prior to the Beacon robbery murder, he understood and accepted the lethal possibilities of carrying and using a knife. There was no abuse of discretion. (See *People* v. *Ashmus* (1991) 54 Cal.3d 932, 973 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

Defendant urges that the court abrogated its duty to weigh probative value against prejudicial effect on the record. But the court need make no express statements on these issues so long as the record affirmatively shows that weighing occurred, and there is an adequate basis for appellate review. (E.g., *People* v. *Crittenden, supra*, 9 Cal.4th 83, 135-136; *People* v. *Clair* (1992) 2 Cal.4th 629, 660-661 [7 Cal.Rptr.2d 564, 828 P.2d 705]; *People* v. *Mickey* (1991) 54 Cal.3d 612, 656 [286 Cal.Rptr. 801, 818 P.2d 84].)

Those requirements are met here. The court had previously sustained a defense irrelevancy objection when the prosecutor asked Rodriguez if she ever *saw* defendant carrying a knife. The court admonished the prosecutor that the time frame was unclear and "you can't proceed [from] the day he was born to the present." It therefore rejected the prosecutor's question "as posed." Moments later, the court overruled defendant's objection that questions about recent knife warnings were irrelevant "as to all [Rodriguez's sons]." In doing so, the court made clear that it believed this line of questions was indeed relevant "as to [defendant]." As an apparent afterthought, defense counsel then immediately posed an objection under Evidence Code section 352. Though the court overruled this objection without

---

[23]As will be recalled, when the prosecutor first broached the issue of knife warnings, he carefully limited the time frame to the period immediately preceding the Beacon robbery murder in which defendant was living at the house on Lemon Hill Avenue. As the questioning proceeded, Rodriguez never specifically answered that she had warned defendant *during this limited time*, and the prosecutor never repeated his "Lemon Hill" qualification. However, defense counsel never objected that the time frame was unclear, or that Rodriguez's answers were nonresponsive. We therefore assume she was responding to the question as originally framed.

further comment, it appears clear the court continued to believe that the evidence was probative on intent, and also concluded that it was not unduly prejudicial. There was no error.

Finally, defendant contends that his counsel's cross-examination of Rodriguez was improperly limited. Counsel asked Rodriguez, "Did [defendant] ever tell you that after he left that Beacon Station that night, that he went to the Guadalupe Church and prayed that the young man wouldn't die?" The prosecutor objected on hearsay grounds. Counsel responded that the defense was entitled to expose portions of the conversation between defendant and Rodriguez which explained or placed in context the damaging admissions elicited by the prosecution. The trial court sustained the prosecutor's objection.

Defendant contends on appeal that this ruling was erroneous under Evidence Code section 356, which provides that if part of an act, conversation, declaration, or writing is placed in evidence, the adverse party may inquire into "the whole *on the same subject*." (Italics added.)[24] The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed. (*People* v. *Pride, supra,* 3 Cal.4th 195, 235.) Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which "have some bearing upon, or connection with, the admission . . . in evidence." (*People* v. *Breaux, supra,* 1 Cal.4th 281, 302; *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1174 [259 Cal.Rptr. 701, 774 P.2d 730].)

Defendant argues that because the prosecution introduced selected portions of his conversation with Rodriguez as an admission he killed Waltrip, he was entitled to use other portions, namely his claim of prayer for Waltrip's survival, to present a fair picture of his mental state, and to bolster his assertion to Rodriguez, already in evidence, that he stabbed Waltrip reflexively. However, we need not determine whether error occurred, because exclusion of the prayer evidence was harmless in any event.

Defendant's claims of momentary remorse would have seemed hollow, insofar as he thereafter boasted of killing Waltrip, and used that murder as a threat when he later committed numerous violent assaults against another victim, Judy N. Indeed, it is unlikely the jury would have believed defendant

---

[24] Evidence Code section 356 provides in pertinent part: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the adverse party . . . ."

went to church "that night" and prayed for Waltrip's survival, since other evidence indicated that after the Beacon robbery, he spent the rest of the evening obtaining drugs, then learned early the next day that Waltrip had died. Under these circumstances, it is not reasonably probable that admission of the prayer evidence would have resulted in a more favorable verdict. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)[25]

4. *Intent to Kill.*

a. *Sufficiency of Evidence.*

Defendant argues that the evidence of intent to kill, an element of the robbery-murder special circumstance, was insufficient. We have already concluded otherwise. (*Ante,* at pp. 128-129.)

b. *Failure to Poll Jurors.*

The jury was instructed that in order to find true the special circumstance of murder in the course of a robbery, it must find that defendant had the specific intent to kill. The verdicts included a finding that the special circumstance was true. At defendant's request, the jurors were individually polled on the murder, knife enhancement, and special circumstance verdicts. Each juror confirmed that these were his or her verdicts.

Defense counsel then indicated, for the record, that the court had previously denied his sidebar request for individual polling on the issue of intent to kill. The prosecutor noted his objection that a finding of intent was subsumed in the special circumstance verdict, and that the law does not require a separate finding or verdict on each element. The trial court agreed.

▋ Defendant contends the trial court erred by denying his counsel's request to poll the jurors individually on whether they had found intent to kill. The claim lacks merit. The law gives a party the right to poll the jurors only on their *verdict*, not on each element thereof. (§ 1163.) If the jury was properly instructed, there is no requirement of a special finding on each fact

---

[25]As a precaution for purposes of future federal review on habeas corpus, defendant has filed a supplemental brief making clear that his challenges regarding the McCord and Rodriguez testimony are asserted under the federal Constitution as well as under state law. (See *Duncan* v. *Henry* (1995) 513 U.S. 364 [130 L.Ed.2d 865, 115 S.Ct. 887] [state remedies not exhausted unless federal issue was "fairly presented" as such in state court].) Defendant cites no reasons, and we find none, why we would reach a different disposition of these claims when asserted on federal grounds. We therefore conclude that defendant's evidentiary arguments provide no basis for reversal under the federal Constitution.

or element underlying a special circumstance verdict. (E.g., *People* v. *Kaurish* (1990) 52 Cal.3d 648, 697 [276 Cal.Rptr. 788, 802 P.2d 278]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 274-275 [221 Cal.Rptr. 794, 710 P.2d 861].)

In appropriate cases, the court *may* protect the record by requiring the jurors to explain, in special findings, which of several alternate theories was accepted in support of a general verdict. (*People* v. *Webster* (1991) 54 Cal.3d 411, 446-447 [285 Cal.Rptr. 31, 814 P.2d 1273].) Here, defense counsel sought no such findings in advance of the jury's deliberations. In any event, the jury could not have found the special circumstance true without finding intent to kill, and there was no chance of misunderstanding.

Defendant asserts that the jurors expressed difficulty in determining intent, and it thus became necessary to ascertain whether they had reached unanimous agreement on that specific element. However, the jurors only indicated some confusion about "*where* intent comes into the first count, verdict in Count One [i.e., murder of Waltrip]." (Italics added.) The court responded by explaining again that the specific intent necessary for a first degree robbery-murder conviction was the intent to rob, and that intent to kill became relevant only in connection with the special circumstance. Contrary to defendant's suggestion, the jurors' question was not evidence that they were divided or uncertain about the existence of intent to kill. No error occurred.

### 5. *Unreported Proceedings.*

Section 190.9, subdivision (a), as in effect since January 1, 1985, requires that all proceedings in capital cases be reported. Defendant complains that, in violation of this statute, his 1989 trial included a number of unreported conferences and proceedings. He claims this error deprived him of a record adequate for appeal, in violation of his due process rights under the Fourteenth Amendment to the United States Constitution.

However, defendant bears the burden of demonstrating that the appellate record is not adequate to permit meaningful appellate review. (E.g., *People* v. *Freeman* (1994) 8 Cal.4th 450, 509 [34 Cal.Rptr.2d 558, 882 P.2d 249]; *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1333-1334, fn. 70 [18 Cal.Rptr.2d 796, 850 P.2d 1].) He has not done so. He cites only one unreported conference that was not resolved by a settled or stipulated statement. He does not claim that the settlements or stipulations are inaccurate. Nor does he indicate how the unreported nature of any proceeding has hampered his ability to raise any appellate issue. He submits that the sheer number of

unreported matters gives rise to "cumulative" harm, especially when considered with his other claims on appeal. We find no basis for such a conclusion. While the court's conduct of unreported proceedings was statutory error, defendant has shown no prejudice. (*Freeman, supra,* 8 Cal.4th at p. 510.)

Though we find no basis for reversal, we add a cautionary word. We recognize that it may seem burdensome to report each routine bench conference, but adherence to that practice can save much time and expense later in preparing the appellate record in a capital case. Therefore, as we have previously done, we admonish trial courts to comply meticulously with section 190.9. (*People* v. *Freeman, supra,* 8 Cal.4th 450, 511.)

### 6. *Prosecutorial Misconduct.*

Defendant claims the prosecutor's arguments included numerous acts of misconduct. Defendant's counsel raised no objection. ██ Defendant concedes we have held that failure to object and request an admonition waives a misconduct claim on appeal unless an objection would have been futile or an admonition ineffective. (*People* v. *Montiel, supra,* 5 Cal.4th 877, 914; *People* v. *Hamilton, supra,* 48 Cal.3d 1142, 1184, fn. 27; *People* v. *Green, supra,* 27 Cal.3d 1, 34.)

However, defendant claims the misconduct in this case was beyond the curative powers of admonitions. He also argues that individual objections would have been futile, because the court's negative response to defense objections at the penalty phase showed its willingness to allow the prosecutor free argumentative rein, and because repeated objections to argument are tactically unwise. He asserts that the trial court violated its statutory duty to control the proceedings, evidence, and argument (§ 1044)[26] by failing to intervene sua sponte. Finally, he urges that as in federal proceedings, if the misconduct was "plain error" resulting in a miscarriage of justice, it should be considered on appeal despite the failure to object. (See, e.g., *United States* v. *Young* (1985) 470 U.S. 1, 15 [84 L.Ed.2d 1, 12, 105 S.Ct. 1038].)

As will appear, we find no misconduct so serious that a curative admonition would have been ineffective. For similar reasons, we are not persuaded by defendant's "plain error" argument. We also reject the premise that the court's treatment of unrelated objections shows that all objections would

---

[26]Section 1044, adopted in 1927, provides: "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

have been futile. Section 1044, of course, does not abolish or supersede the rules of trial objection or appellate waiver. We therefore conclude that defendant waived the claims of misconduct he now raises.

In any event, those claims fail on the merits. In every instance cited, misconduct either did not occur or was harmless even absent an admonition.

### a. *References to Victims' Feelings.*

Defendant first contends that the prosecutor improperly invoked sympathy for the victims by exhorting the jury to view the crimes from the victims' perspective. In one instance, while discussing the forcible sexual assaults against Judy N., he remarked, "I mean, this woman was going through hell. At one point she even said, I wish he'd have killed me." Shortly thereafter, he commented again that defendant "[had] this woman scared to death, pleading at one point for death in her own mind."

Later, in his rebuttal to defense counsel's argument, the prosecutor said, "You know it's funny. Mr. Tedmon [defense counsel] tells us about Scotland's constitution and talks about the defendant's rights a lot. [¶] I want you to think about John Waltrip['s] right to come into the front area of the store when he was called by his co-employee and his right to come walking up in there and not be killed and not be stabbed by this man. [¶] I want you to think about what Tina Cheatam said and what Mr. Galvin said about that arm going back and that knife in the hand and the knife in the gut of John Waltrip when he heard the punch and he heard the noise. Because that's what this case is about, you know. [¶] We hear a lot about the defendant's rights. There's a dead man. He couldn't testify."

It is "settled that an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt. [Citations.]" (*People* v. *Stansbury* (1993) 4 Cal.4th 1017, 1057 [17 Cal.Rptr.2d 174, 846 P.2d 756].)

We agree with the People that the remarks about Judy N.'s fear and degradation did not violate this rule in context. When discussing sex and kidnapping offenses involving the elements of force, fear, and lack of consent, the prosecutor was entitled to argue the existence of those elements in vigorous terms.

The People suggest the Waltrip remarks were similarly proper in context, since they merely rebutted defense counsel's extensive emphasis on the

rights of the defendant, to the implied exclusion of the victims. But this is not proper rebuttal, since the guilt jury is not to balance the defendant's right to a fair trial against the victim's right to life or safety.

Nonetheless, an admonition would have cured any effect of the prosecutor's improper comments, and we find no prejudice in any event. Much of the passage to which defendant objects simply focused, albeit in stark terms, on the factual details of the Waltrip stabbing, as described by eyewitnesses to the event. References to the murder victim's "rights" were relatively brief and were not repeated. The evidence that defendant killed Waltrip was essentially conclusive, and the evidence that he intended to kill was strong. A momentary appeal to victim sympathy could have little effect on either issue. The jurors deliberated over three separate days and asked questions suggesting careful evaluation of the evidence. They failed to agree on the kidnapping-for-sex enhancements originally charged (§ 667.8, subd. (a)), causing those enhancements to be dismissed. It is not reasonably probable that a result more favorable to the defendant would have been reached absent the misconduct or with a curative admonition. (*People* v. *Stansbury*, *supra*, 4 Cal.4th 1017, 1057.)

### b. *Linkage of Beacon and Judy N. Crimes.*

Defendant next contends the prosecutor's argument stressed improper linkage between the Beacon and Judy N. crimes, thus causing the Judy N. charges to prejudice him in the Beacon matter. In particular, defendant objects to the prosecutor's remark, when discussing the Judy N. incident, that "[t]his was done for simple abuse and domination. This man is tough with a gun. Tough with a woman. *Tough with a young man that's unarmed when he's got a knife.*" (Italics added.)

This fleeting reference was entirely proper. The prosecutor sought only to emphasize that in each of the charged offenses, defendant had employed a lethal weapon to subdue an unarmed victim. When arguing joined counts, the prosecutor was not required to refrain from mentioning the two matters in a single section of his argument, or from noting that each involved a charged weapons enhancement. No misconduct occurred.

Even if the prosecutor's remarks had been improper, we would find no basis for reversal. The cited comment was brief, and the violence of the two incidents, including the weapon use in each case, was already obvious. Hence, even absent an admonition, no prejudice arose.

### c. *Disparagement of Defense Expert.*

Defendant complains that the prosecutor disparaged the professional integrity of the defense expert witness, Dr. Hall, and implied that her testimony was intended to deceive the jury. In particular, defendant urges, the

prosecutor implied that witness Galvin's eyewitness account of the Beacon stabbing was more believable than Dr. Hall's forensic reconstruction of the incident because Galvin, unlike Hall, "wasn't paid a hundred dollars for his testimony." Defendant also cites the prosecutor's rebuttal argument, which described Dr. Hall as a "so-called expert, so-called because a real scientist would never stretch any [principle] for a buck."

There was no misconduct. Argument may not denigrate the integrity of opposing *counsel*, but harsh and colorful attacks on the credibility of opposing *witnesses* are permissible. (*People* v. *Sandoval* (1992) 4 Cal.4th 155, 180, 184 [14 Cal.Rptr.2d 342, 841 P.2d 862]; *People* v. *Cummings*, *supra*, 4 Cal.4th 1233, 1302.) Thus, counsel is free to remind the jurors that a paid witness may accordingly be biased and is also allowed to argue, from the evidence, that a witness's testimony is unbelievable, unsound, or even a patent "lie." (*Sandoval*, *supra*, at p. 180; see *People* v. *Price*, *supra*, 1 Cal.4th 324, 457.) Here, the prosecutor's argument merely focused on the evidentiary reasons why the purported scientific nature of Dr. Hall's opinions could not be trusted over Galvin's eyewitness account. Claims that Dr. Hall had "stretch[ed] [a principle] for a buck" were not out of place in that context.

 d. *Argument Regarding Intent to Kill.*

Defendant claims the prosecutor misled the jury about the proof necessary for intent to kill. As previously noted, the defense theory was that defendant lacked homicidal intent when he stabbed John Waltrip because the act was merely a reflexive attempt to get Waltrip away from him. Seeking to counter this theory, the prosecutor stressed that intent was not the same as premeditation or deliberation and could be a "low-level process." The prosecutor gave the example of absentmindedly swatting a mosquito that alights on one's face or arm. Even if the conscious purpose is only to get rid of the mosquito, the prosecutor suggested, "you probably kill him. . . . This is a very low-level thing. Same thing here, except the evidence is overwhelming as to what this person or as to what the defendant intended to do at the time he stabbed John Waltrip."

We see nothing improper. The prosecutor merely illustrated the correct principle that if the jury found defendant's use of a lethal weapon with lethal force was purposeful, an intent to kill could be inferred, even if the act was done without advance consideration and only to eliminate a momentary obstacle or annoyance. The prosecutor did not suggest the jury was prohibited from viewing defendant's action as a true reflex or "startle response" and thus declining to find intent to kill. The jury was repeatedly instructed that in order to sustain the special circumstance allegation, it must find that

defendant had the specific intent to kill a human being. The instructions also advised that while intent to kill could be shown by circumstantial evidence, such evidence could prove intent only if it "cannot be reconciled with any other rational conclusion." There is no reasonable likelihood the jury was misled. (E.g., *People* v. *Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40].)

### e. *Knife Use as Evidence of Intent to Kill.*

Finally, defendant complains about the prosecutor's "nonsensical" argument that use of a knife is stronger evidence of intent to kill than use of a gun. In support of this claim, the prosecutor observed that a knife, unlike a gun, must be used at close range, cannot go off accidentally, and must be "loaded" before each use. No misconduct occurred. The prosecutor sought only to make the argumentative point that it is more difficult to kill accidentally with a knife than with a gun, because each wound must be purposefully inflicted from a minimal distance. The argument was not devoid of reason, and the jury was capable of evaluating its merit. There is no reasonable likelihood that the jury construed or applied the prosecutor's remarks in an objectionable fashion.

### C. *Issues at Penalty Trial.*

#### 1. *Evidentiary Issues.*

##### a. *Testimony of James Barger.*

As previously noted, the prosecution presented aggravating evidence that on August 14, 1981, defendant fired rifle shots at a victim hiding in the yard of a home on Priscilla Lane. James Barger, who lived in a neighboring house, testified that he saw the shots fired by a young Hispanic male who was wearing a long overcoat on a summer night. Barger detained the shooter at gunpoint, but a crowd of youths assembled, and the gunman walked away with them. Barger followed, keeping the shooter in sight until the police arrived. Barger then pointed out the gunman to a responding officer, Paul Llano. Defendant, wearing a long overcoat, was arrested at the scene. Barger testified he identified the shooter in a parole revocation hearing about two and one-half months after the shooting incident. However, Barger could not identify defendant at the penalty trial.

At the conclusion of Barger's direct examination, defense counsel sought a delay of Barger's cross-examination so the prosecutor could determine whether tapes or transcripts of the revocation hearing were available. Counsel stressed he was not citing the prosecutor for a discovery violation

because the prosecutor had represented he "just learned" of Barger's prior testimony when talking to the witness before he took the stand. The prosecutor confirmed that he was not previously aware Barger had testified at a revocation hearing. The court delayed Barger's cross-examination until the following morning.

The next day, the prosecutor reported that all tapes and records of defendant's 1981 Youth Authority revocation hearing had been routinely purged after three years as provided by law. Defendant, allowed to address the court, represented that the dismissal of the revocation charges occurred because Barger's testimony at the revocation hearing was disbelieved. Counsel moved for a penalty mistrial, and alternatively to strike Barger's direct testimony. Among other things, counsel asserted that loss of the revocation tapes and transcripts deprived the defense of effective cross-examination of Barger. The defense motions were denied.

Defendant first argues that use of the Priscilla Lane incident as aggravating evidence under section 190.3, factor (b), was invalid because dismissal of the revocation charges arising from this incident was tantamount to an "acquittal" of the underlying offenses.[27] Defendant raised no such challenge at trial, and it fails in any event. ██ Juvenile proceedings are not criminal prosecutions. (Cf. *People* v. *Burton* (1989) 48 Cal.3d 843, 861 [258 Cal.Rptr. 184, 771 P.2d 1270] [juvenile wardship adjudication is not criminal conviction].) ██ In any event, dismissal of revocation charges, even on the merits, does not mean the parolee or probationer has been "acquitted" of any offense. Indeed, a "merits" dismissal of adult revocation charges would not preclude relitigation of the same allegations in a criminal prosecution. (See *Lucido* v. *Superior Court* (1990) 51 Cal.3d 335 [272 Cal.Rptr. 767, 795 P.2d 1223, 2 A.L.R.5th 995] [failure of proof at revocation hearing does not raise double jeopardy, res judicata, or collateral estoppel bars against subsequent criminal trial].) Defendant's claim must therefore be rejected.

Defendant next asserts that Barger's testimony should have been stricken for two related reasons. First, he insists, the prosecutor improperly elicited that evidence without informing the defense of Barger's prior testimony or furnishing the defense with its contents. Second, he argues that loss of the tapes of Barger's prior testimony denied him his Sixth Amendment confrontation right to effective cross-examination. Neither claim has merit.

---

[27]Under section 190.3, factor (b), aggravating evidence at the penalty phase may include "[t]he presence . . . of criminal activity by the defendant which involved the use or attempted use of force or violence . . . ," but section 190.3 generally prohibits the introduction of "evidence of prior criminal activity . . . for which the defendant was prosecuted and acquitted."

As defense counsel conceded at trial, no record evidence contradicts the prosecutor's representation that he had little advance knowledge of Barger's prior testimony at a revocation hearing. Moreover, earlier notice on this specific issue would have made no material difference, since the tapes had been lawfully destroyed in the ordinary course long before defendant committed his capital crimes.[28]

 Nor did loss of the tapes require the striking of Barger's trial testimony under the confrontation clause. Defendant had no separate Sixth Amendment right, greater than his due process right under *California v. Trombetta, supra*, 467 U.S. 479, to the preservation of official records. While recorded prior testimony may have fortuitous impeachment value, the state has no constitutional obligation to maintain such records indefinitely in case they later become relevant for impeachment in another proceeding. And their loss or destruction in the ordinary course cannot mean that the witness is barred from testifying under oath on the same subject at a later date.

Barger disclosed on the stand that he had identified the perpetrator in the prior revocation hearing but could not identify defendant now. Defense counsel had a full opportunity to highlight Barger's current uncertainty and to question Barger about circumstances which might undermine the prior identification. In doing so, counsel presumably had the assistance of defendant himself, who was present at the prior hearing. There was no Sixth Amendment violation.

b. *Threat to Kill Barger.*

Officer Llano testified that after arresting defendant in connection with the shooting incident of August 14, 1981, he placed defendant and another suspect in the backseat of his patrol car and tape-recorded their conversation. On the recording, according to Llano, defendant threatened to return and kill Barger.

 Defendant complains that evidence of the threat against Barger should have been excluded because it was not included in the statutory

---

[28]Defense counsel claimed at trial that destruction of the tapes violated the state's duty, under *People v. Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], to preserve exculpatory evidence. The trial court correctly rejected this argument under *California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528], which is now the law in California. (E.g., *People v. Stansbury, supra,* 4 Cal.4th 1017, 1055; *People v. Johnson, supra,* 47 Cal.3d 1194, 1233-1234.) Under *Trombetta*, the state's duty to preserve evidence is limited to that evidence whose exculpatory value was apparent before destruction. If the records of defendant's 1981 juvenile revocation proceeding were destroyed three years thereafter (i.e., in 1984), the authorities could not then have known they would be helpful at the penalty trial for capital crimes committed in 1987. (See *People v. Melton* (1988) 44 Cal.3d 713, 751-752 [244 Cal.Rptr. 867, 750 P.2d 741].)

notice of aggravating evidence filed by the prosecution. (See § 190.3.) The error, he asserts, violated his rights to a reliable penalty determination under the Eighth and Fourteenth Amendments.

However, while defendant objected to this testimony on hearsay grounds, he never raised a notice objection. Hence, the claim is waived on appeal. (See *People* v. *Johnson, supra,* 6 Cal.4th 1, 51; *People* v. *Clark* (1990) 50 Cal.3d 583, 626, fn. 34 [268 Cal.Rptr. 399, 789 P.2d 127].)

In any event, the contention lacks merit. The notice of aggravating evidence stated that the prosecution intended to introduce evidence "of the circumstances underlying [defendant's] arrest" for the August 14, 1981, shooting assault against Andrew Benanato, "as referenced in Sacramento Police Department report #81-49647." The police report, which was subject to defense discovery, contained reference to the tape-recorded threat uttered by defendant after he was placed under arrest.

"[T]he prosecutor is not prevented from introducing all the circumstances of a duly noticed incident or transaction simply because each and every circumstantial fact was not recited therein. (See, e.g., *People* v. *Howard* (1988) 44 Cal.3d 375, 424-425 [243 Cal.Rptr. 842, 749 P.2d 279].) The notice is sufficient if it gives defendant 'a reasonable opportunity' to prepare a defense to the allegations. (*Howard, supra,* at p. 425.)" (*People* v. *Pride, supra,* 3 Cal.4th 195, 258.)

Here, the notice of aggravation fairly apprised the defense of all the circumstances surrounding defendant's arrest for the August 14, 1981, incident which might be introduced in aggravation, and there was no unfair surprise. Defendant's claim of a notice violation must therefore be rejected.

c. *Testimony of Richard Lam.*

Richard Lam was on duty in a Chief's Auto Parts Store when it was robbed by two men on the evening of February 16, 1987. Ten months later, he identified defendant as one of the robbers from a police lineup of five photographs. He positively identified defendant at the November 1989 penalty trial.

Before the jury heard Lam's testimony, he was examined in a preliminary voir dire hearing under *People* v. *Phillips* (1985) 41 Cal.3d 29 [222 Cal.Rptr.

127, 711 P.2d 423].[29] During cross-examination in the *Phillips* hearing, Lam disclosed that several days earlier, Jeanne Flannery, a process server from the district attorney's office, had presented him with a subpoena to appear as a witness. Flannery volunteered the information that defendant had already been convicted of murder and rape and was now in the penalty phase of his capital trial. Lam's testimony was needed, Flannery said, to show that defendant's conduct "had been going on for awhile." At the conclusion of the *Phillips* hearing, the court admitted Lam's identification testimony.

When cross-examined during his jury testimony, Lam again recounted his conversation with Flannery. At the conclusion of Lam's jury testimony, defense counsel moved to strike his identification of defendant, and alternatively for a mistrial, on grounds that the identification had been tainted by Flannery's remarks. These motions were denied. The court admonished the prosecutor to warn Flannery against improper commentary in the future, but it concluded that Lam was a "strong and very definite witness" who was not influenced by Flannery's words.

■■■ On appeal, defendant again asserts that Flannery's comments amounted to an impermissibly suggestive pretrial identification procedure in violation of his federal constitutional right of due process. (E.g., *Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967].) Flannery's remarks prejudiced Lam's in-court identification, defendant suggests, by disclosing that defendant was already a convicted murderer and rapist, thus making Lam less reluctant to testify against him.

We do not accept the premise of undue suggestion. Flannery would have been better advised to avoid unnecessary conversation with Lam about his appearance as a witness. However, her casual explanation of the reason for the subpoena she was serving provided only information of which any prospective witness in a capital penalty trial would presumably be, or become, aware. It is unrealistic to assume that such a witness would or should remain ignorant of the reasons for his testimony.

On the contrary, one served with a subpoena requiring his presence in court would be expected to ascertain why that appearance was necessary. Indeed, once advised from the subpoena itself of the name of the case in which he was required to testify, the witness could presumably learn the details of its progress and purpose from the public media. Nor is it conceivable that the witness would take the stand unaware that his duty was

---

[29]In *Phillips, supra,* we suggested it may sometimes be advisable at the penalty phase to conduct a preliminary inquiry, outside the jury's presence, to determine whether each element of an uncharged crime offered in aggravation is supported by substantial evidence. (41 Cal.3d at p. 72, fn. 25.) Such a procedure has come to be known as a *"Phillips* hearing."

truthfully to disclose whatever personal knowledge he had about the person on trial.

Lam was subpoenaed because he had *already* identified defendant as one of the Chief's Auto Parts robbers. Flannery only advised that the man Lam had previously identified was now at the penalty phase of trial in another matter, and that Lam was being called as a witness to confirm his identification. Nothing Flannery said was calculated to *obtain* such an identification from an uncertain witness. If knowledge such as Flannery imparted were deemed to raise a constitutional issue of impermissible suggestion, the identification testimony of all but the most willfully uninformed penalty witnesses would be at risk. We see no due process implications in the conversation between Lam and Flannery.

Even if Flannery's statements were unduly suggestive, we must uphold the trial court's decision to permit jury consideration of Lam's in-court identification.　　　When an eyewitness has been subjected to undue suggestion, the factfinder must nonetheless be allowed to hear and evaluate his identification testimony unless the " ' "totality of the circumstances" ' " suggests " 'a very substantial likelihood of irreparable misidentification.' " (*Manson* v. *Brathwaite* (1977) 432 U.S. 98, 106 [53 L.Ed.2d 140, 149, 97 S.Ct. 2243], quoting *Neil* v. *Biggers* (1972) 409 U.S. 188, 199 [34 L.Ed.2d 401, 411, 93 S.Ct. 375]; *Manson, supra*, at p. 116 [53 L.Ed.2d at p. 155], quoting *Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967].) No such likelihood appears here.

The factors to be considered include (1) the witness's opportunity to view the suspect at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of any prior description by the witness, (4) the level of certainty displayed by the witness at a suggestive confrontation, and (5) the length of time between the crime and the confrontation. (*Neil* v. *Biggers, supra*, 409 U.S. 188, 199-200 [34 L.Ed.2d 401, 411-412].) Here, it is undisputed that Lam saw the robbers on two separate occasions in a well-lit store. Moreover, he was no mere "casual observer" (*id.* at p. 200 [34 L.Ed.2d at pp. 411-412]), but a crime victim subjected to a close, extended encounter with the perpetrators. These factors weigh in favor of the reliability of his identification.

Defendant asserts, however, that Lam described the robbers inaccurately after the holdup and was uncertain in his original identification from a photo lineup itself tainted by undue suggestion. Defendant also notes that the photo identification was delayed until 10 months after the Chief's Auto Parts robbery, and that Lam's identification in court, which occurred after Flannery's suggestive remarks, was separated from the crime by nearly 3 years.

The time lapses weigh against reliability to some degree. However, the record does not strongly support defendant's other claims. Lam originally described two men from five feet six inches to five feet eight inches tall, and from one hundred sixty-five to one hundred eighty-five pounds. At trial, Lam said the "shorter" robber, whom he identified as defendant, was five feet four or five inches tall and weighed one hundred forty to one hundred sixty pounds. These estimates are not so disparate as to cast particular suspicion on Lam's reliability at trial.

Moreover, the evidence, viewed as a whole, indicates the photo lineup was neither suggestive nor seriously uncertain. Defendant's claims of a suspect photo identification are based primarily on selected excerpts from Lam's testimony. For example, at the *Phillips* hearing, Lam indicated that before he viewed the photos, the officer told him a suspect in the February 1987 robbery had been arrested, and Lam thus had the impression this suspect's photo would be in the group. Lam also conceded he identified defendant's photo as "possibly" one of the two robbers. And Lam acknowledged he was "more certain" of his face-to-face identification at trial than of his photo identification. Both at the *Phillips* hearing and before the jury, Lam estimated he looked at the photos for up to 20 minutes before making his decision.

Before the jury, however, Lam retracted some of his prior testimony. Lam said his prior memory about possible suggestive circumstances in the photo identification was in error. As he now remembered, the officer only told him the suspect "might be in here, he might not." Accordingly, Lam testified, he never had the impression that the suspect's photo "would" be included.

This version of events was corroborated by Sacramento Police Officer Ronald Wong, who conducted the photo lineup. Wong testified he told Lam that "the lineup could or could not contain a photo of the suspect, and that he's under no obligation to select any of the photos shown to him."

Wong, a veteran of such procedures, also disputed Lam's estimate of the time taken to select defendant's photo. Wong said that a witness typically selects a photo, if at all, within five minutes or so, and he did not recall Lam taking an unusual amount of time. If Lam had taken 15 or 20 minutes, Wong stated, he would have noted the indecision in his report. Wong further testified that in his report, he ranked Lam's certainty of identification as eight on a scale of one (lowest) to ten (highest).

Moreover, Lam consistently stated that he selected defendant's photo in part because it depicted a distinct feature he had observed in the shorter

robber—a bad case of acne. Defendant implies that reliance on this unusual feature somehow detracts from the reliability of Lam's photo identification, but we conclude otherwise. In our view, Lam's recollection and use of a distinct aspect of the robber's appearance enhances, rather than undermines, the inference that his photo identification was accurate. (Cf., e.g., *Neil* v. *Biggers, supra,* 409 U.S. 188, 201 [34 L.Ed.2d 401, 412] [rape victim testified there was something about assailant's face "I don't think I could ever forget"].)

Finally, Lam insisted on the stand that after seeing defendant in person for the first time since the Chief's Auto Parts robbery, he had "no doubt" defendant was one of the robbers. Lam unequivocally denied any influence from Flannery's comments. Though Lam knew that defendant had been convicted of violent felonies, and though Lam understood that his testimony might help send defendant to the gas chamber, Lam emphasized that Flannery never said defendant's guilt of the Chief's Auto Parts robbery had been proven. Lam further stressed his understanding that his evidence was relevant only "[i]f [defendant] was the person that robbed me."

Weighing all these circumstances, we conclude that neither Flannery's comments to Lam, nor any other aspect of the identification process, caused a " 'very substantial likelihood of irreparable misidentification.' " (*Manson* v. *Brathwaite, supra,* 432 U.S. 98, 116 [53 L.Ed.2d 140, 155].) "Short of that point, such evidence is for the jury to weigh. . . . [E]vidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (*Ibid.*) Defendant's claim that Lam's testimony should have been excluded or stricken must therefore fail.

2. *Claims of Instructional Error.*

a. *CALJIC No. 8.88.*

The trial court instructed, in the words of former CALJIC No. 8.84.2 (now CALJIC No. 8.88), that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." Defendant urges this instruction improperly informed the jury that death was compelled if aggravation outweighed mitigation. He asserts the court should have instructed sua sponte that the jury could return a verdict of life imprisonment without possibility of parole even if it found that aggravation outweighed mitigation. The error, he claims, misled the jury about its sentencing discretion and deprived him of his rights to due process and a reliable penalty determination under the Eighth and Fourteenth Amendments.

However, defendant's failure to request a clarifying instruction waives that claim. (E.g., *People* v. *Rodrigues, supra,* 8 Cal.4th 1060, 1192; *People* v. *Johnson, supra,* 6 Cal.4th 1, 52.) ■ In any event, we have repeatedly held that the language of former CALJIC No. 8.84.2, taken directly from our majority opinion in *People* v. *Brown* (1985) 40 Cal.3d 512, 541-542, footnote 13 [220 Cal.Rptr. 637, 709 P.2d 440], is not inadequate or misleading. By advising that a death verdict should be returned only if aggravation is "so substantial in comparison with" mitigation that death is "warranted," the instruction clearly admonishes the jury to determine whether the balance of aggravation and mitigation makes death the appropriate penalty. (E.g., *People* v. *Breaux, supra,* 1 Cal.4th 281, 315-316; *People* v. *Sully, supra,* 53 Cal.3d 1195, 1244-1245.) Hence, there was no need for the additional instruction defendant now suggests. (See, e.g., *People* v. *Rodrigues, supra,* 8 Cal.4th 1060, 1192.)

b. *Guilt Phase Instruction to Disregard Consequences.*

■ Defendant claims the court erred by failing to instruct sua sponte that the penalty jury must not follow the guilt phase instruction to render a "just verdict regardless of the consequences" (CALJIC No. 1.00). This failure, defendant asserts, diminished the jury's sense of responsibility in determining whether defendant should suffer the death penalty. Defendant therefore asserts violations of his state and federal constitutional rights to due process, a fair jury trial, and a reliable penalty determination.

We are not persuaded. As defendant concedes, the jury received a blanket cautionary admonition to "[d]isregard *all* other instructions given to you in other phases of this trial." (Italics added.)

Moreover, the jury was specifically instructed that it could consider, in mitigation, "[a]ny other circumstance which extenuates the gravity of the crime, even though it may not be a legal excuse for the crime, *and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial.*" (Italics added.) An addendum was attached to this particular instruction that "[y]ou must disregard any jury instructions given to you in the [guilt] or innocence phase [of] this trial which conflicts with this principle."

Defendant points to no argument of counsel which sought to exploit the notion that CALJIC No. 1.00 remained applicable at the penalty phase. Under these circumstances, there is no reasonable possibility the jury was misled about the nature and scope of its sentencing task. (See *People* v. *Mayfield* (1993) 5 Cal.4th 142, 183 [19 Cal.Rptr.2d 836, 852 P.2d 331].)

c. *Failure to Instruct re Meaning of "Life Without Parole."*

Defendant requested an instruction that the jury must assume a sentence of death meant defendant would be executed, while a sentence of life imprisonment without possibility of parole meant "[defendant] will spend the rest of his life confined in state prison and will not be paroled at any time." The instruction was not given. The omission was entirely proper under California law, since the proffered instruction is inaccurate. The Governor may ameliorate any sentence by use of the commutation or pardon power, and it is thus " 'incorrect to tell the jury the penalty of . . . life without possibility of parole will inexorably be carried out' [citation]." (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1277 [270 Cal.Rptr. 451, 792 P.2d 251], quoting *People* v. *Thompson* (1988) 45 Cal.3d 86, 130 [246 Cal.Rptr. 245, 753 P.2d 37].)

However, defendant claims the omission of this instruction was federal constitutional error under an intervening United States Supreme Court decision, *Simmons* v. *South Carolina* (1994) 512 U.S. 154 [129 L.Ed.2d 133, 114 S.Ct. 2187]. We find *Simmons* inapposite.

In *Simmons*, a recidivist's prior felony convictions rendered him statutorily ineligible for parole if he suffered a further conviction for a violent crime. In his subsequent trial for a capital offense, the jury understood that he would suffer "life imprisonment" if not sentenced to death. However, the trial court prohibited defense counsel from inquiring about prospective jurors' understanding of "life imprisonment," and the court barred all reference during the trial to the defendant's ineligibility for parole. When arguing for the death penalty, the prosecutor emphasized that defendant Simmons represented a future danger to society if left alive. In multiple opinions, seven members of the United States Supreme Court concluded that the resulting death judgment must be reversed.

Justices Blackmun, Stevens, Souter, and Ginsburg reasoned that, at least where the prosecution makes defendant's future danger to society a capital penalty issue, the due process clause gives the defendant the right to "explain or deny" the prosecution's theory by informing the jury of the actual duration of prison confinement if a life sentence were imposed in lieu of death. (*Simmons* v. *South Carolina, supra*, 512 U.S. 154, ___ [129 L.Ed.2d 133, 141-146, 114 S.Ct. 2187, 2192-2196].) The plurality also rejected the contention that the jury in the *Simmons* trial must have inferred ineligibility for parole when told that the term "life imprisonment" should be understood in its "plain and ordinary" meaning and that "parole" was not to be considered. (*Id.* at pp. ___-___ [129 L.Ed.2d at pp. 141-146, 114 S.Ct. at pp.

2196-2198].) In a separate opinion, Justice O'Connor, joined by the Chief Justice and Justice Kennedy, expressed similar views. (*Id.* at pp. ___-___ [129 L.Ed.2d at pp. 149-151, 114 S.Ct. at pp. 2200-2201] (conc. opn. of O'Connor, J.).)

Defendant claims that because the prosecutor emphasized his future dangerousness in closing argument, the instruction he requested was necessary under *Simmons*. Defendant is mistaken. The due process deficiencies in the *Simmons* trial do not exist in a California capital penalty trial. Every California penalty jury is specifically instructed that it must choose between two possible sentences, death or "confinement in [the] state prison for a term of life *without* [the] possibility of parole." (§ 190.3, italics added; CALJIC No. 8.88 (5th ed. 1988); former CALJIC No. 8.84.2.) Indeed, the plurality opinion in *Simmons* itself noted that California is one of seventeen states in which a capital penalty jury is "expressly informed of the defendant's ineligibility for parole," and one of nine states in which a capital jury's only sentencing alternatives are death or life without parole. (*Simmons* v. *South Carolina, supra*, 512 U.S. 154, ___, fn. 7 [129 L.Ed.2d 133, 144, 114 S.Ct. 2187, 2195].)

Nothing in *Simmons* indicates that once the jury knows the defendant is ineligible for parole under the sentencing scheme it is required to apply, it must receive further instructions designed to deflect concern that events which might actually occur in the future, such as commutation or pardon, would nonetheless allow the defendant's release. Nor does *Simmons* suggest the jury must be instructed in a manner that affirmatively conceals the possibility of commutation or pardon. We decline to infer such a federal constitutional requirement. Defendant's claim of error must therefore be rejected.[30]

### 3. *Prosecutorial Misconduct.*

#### a. *Cross-examination of Defendant at Enhancement Trial.*

■ Defendant claims that during the separate jury trial on the "prior prison term" enhancement alleged in the complaint (§ 667.5), the prosecutor committed deceptive and "reprehensible" conduct warranting a penalty reversal. The prosecutor, defendant insists, withdrew a meritorious objection to defendant's testimony on irrelevant issues, thus creating an opportunity to

---

[30]Precisely because defendant's jury was informed that the only alternative to death was life without parole, the prosecutor in this case could not make the *Simmons* argument that defendant might pose a danger if released into the community. Instead, the prosecutor argued that defendant represented a danger *in prison*. Further instructions on the commutation or pardon power would be of little use in rebutting this argument.

conduct a prejudicial cross-examination of defendant. We find no basis to overturn the penalty judgment.

The relevant facts are as follows: Prior to commencement of the penalty phase, defendant received a jury trial (§ 1025) on the noncapital enhancement allegation that he had suffered a prior conviction and prison term (§ 667.5) for shooting at an inhabited dwelling (§ 246). Before the enhancement trial began, defendant moved to strike the prior conviction as constitutionally invalid. Defendant claimed his guilty plea in the prior case was not voluntary and intelligent because he was unaware it might have enhancement consequences in a future prosecution. The trial court denied the challenge.

At the ensuing jury trial, the prosecution rested after presenting evidence on the truth of the enhancement allegation. Defense counsel then began an opening statement indicating that defendant would be called as a witness on the issue of the prior's validity. The prosecutor objected that validity was irrelevant. The court overruled the objection, stating that it could not prevent argument, though it might later exclude irrelevant *evidence.*

At the conclusion of the defense statement, the court asked the prosecutor, outside the jury's presence, whether "[y]ou were going to make some objection to . . . [defendant's] testimony." The prosecutor responded that he "withdr[e]w" the objection "[i]f [defendant] wants to testify."

Defendant took the stand. On direct examination, he insisted that when he pled guilty to the charge of violating section 246, no one told him the conviction could be used against him in a later case. Defendant further stated he would not have pled guilty had he understood this consequence.

The prosecutor then cross-examined defendant at length. Seeking to attack defendant's claim that he would not have pled guilty but for his ignorance of the consequences in a later case, the prosecutor asked sharp questions about defendant's experience with the juvenile and criminal justice systems, and about the facts underlying the charges to which defendant had entered a plea. On three occasions, defense objections to argumentative questions were sustained, but no admonition was sought or given.[31] Other objections by the defense, made on grounds that cross-examination was exceeding its permissible scope, were denied.

---

[31]Thus, at one point, defendant said he pled guilty in the earlier case partly because his mother wanted him to "get help." The prosecutor responded, "You didn't listen to her when she asked you to turn yourself in [in] this case, though?" Defense counsel's objection that this was "completely outside the case" was sustained. Later, challenging defendant's claim that he had pled guilty on bad legal advice, the prosecutor asked sarcastically, "You're pretty well pushed around by an attorney, you'll do what he says, no matter what it is?" Defense counsel

In his argument, the prosecutor urged that neither the validity of the prior conviction nor the truth of the underlying charges was relevant. The defense had "insisted" on addressing those issues, said the prosecutor, but "why it was necessary to go into that, I don't know." Later, when defense counsel tried to tell the jury it would be allowed to determine whether the prior conviction was valid, the prosecutor objected successfully, and the court admonished the jury it would be told to find only whether defendant suffered a conviction and a prison term as alleged. The instructions themselves made no reference to the issue of validity.

After the jury retired, defense counsel moved for a mistrial on grounds of prosecutorial misconduct. Counsel accused the prosecutor of withdrawing his initial objection to defendant's testimony so he could use that testimony "as a vehicle for opening up new areas of criminal conduct behind the [prior prison term] allegation and conviction in the [section] 246 proceeding." Counsel further complained that after expressly waiving objection to evidence on the issue of validity, the prosecutor improperly sought to block the defense from arguing the relevance of that evidence.

The prosecutor responded that whether or not he objected to testimony, "the law is plain" that the validity of a prior is not for the jury, but a question of law for the court. Counsel was put on notice, the prosecutor suggested, when an initial objection to counsel's argument was made, and defendant must take the consequences of counsel's decision to put defendant on the stand anyway. The motion for mistrial was denied.

On appeal, defendant claims the prosecutor "sandbagged" the defense, thus violating his ethical duty to obtain a conviction only by fair means. We are not persuaded. The record leaves little doubt that the prosecutor took full advantage of an unexpected opportunity to subject defendant to vigorous cross-examination. However, the prosecutor engaged in no deceitful or unethical tactics to achieve that opportunity.

On the contrary, the prosecutor made clear at the outset his correct belief that any testimony by defendant about the circumstances of his plea of guilty to the section 246 charge would be irrelevant. The defense, for its own

---

objected that this was a "mischaracterization," and the objection was sustained. Still later, when defendant insisted that he never intended to shoot "at" an inhabited building, the prosecutor asked, "Did you accidentally shoot into the occupied dwelling, like you accidentally stabbed John Waltrip?" Defense counsel objected that this was "a really disgusting question," and the objection was sustained.

purposes, nonetheless decided to present such evidence.[32] Even if the prosecutor ultimately failed to object, the consequences of the defense decision cannot be laid at the prosecutor's door. Moreover, once defendant testified that he had pled guilty in ignorance of the consequences, the prosecutor was entitled to assume this claim might affect the jury as the defense intended. Hence, he properly sought to rebut the claim by showing that defendant was somewhat experienced in the justice system, and that his plea was determined by the truth of the charge and the strength of the evidence.

In any event, there was no prejudice warranting reversal of the penalty judgment. The prosecutor's sparring with defendant actually produced very little information not otherwise disclosed. For example, the penalty jury would have known in any event of defendant's conviction under section 246. That it also learned defendant's version of the circumstances of this violent crime could have had but a marginal effect.[33] During the cross-examination of defendant, there was some mention of a 1979 Youth Authority parole, and of "your trial for robbery with the use of a knife out at juvenile hall." But these references appear to concern the Daniel Rypich robbery, the facts of which were presented in full at the penalty phase. Under the circumstances, and given the ample valid evidence of defendant's violent criminal career, there appears no reasonable possibility that the challenged cross-examination affected the penalty verdict. (*People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135].)[34]

b. *Argument Against Sympathy or Mercy.*

■■■ In his penalty phase arguments, the prosecutor urged at some length that defendant was not deserving of sympathy or mercy, and he challenged the jury to consider whether "the defendant deserves to live." Defendant contends these arguments suggested that sympathy and mercy were irrelevant to the penalty determination, contrary to the rule that defendant is

[32]Until our decision in *Curl* v. *Superior Court* (1990) 51 Cal.3d 1292 [276 Cal.Rptr. 49, 801 P.2d 292], a case decided one year after defendant's trial, it was apparently not settled that attacks on the validity of a prior conviction used for enhancement present exclusively a question of law for the court, while the jury is to decide only whether the accused has "suffered" such a conviction. (*Id.* at pp. 1301-1302, fn. 6; see § 1025.)

[33]Defendant testified that he had brought 15-year-old Kathy Gomez home from "the fair" and was inside her residence attempting to set up "a new date" when her stepfather, armed with a pistol, ordered him out of the house. Seeking to show the stepfather "he ain't the only one in Sacramento that can get his hands on a gun," defendant returned and fired shots, but he insisted he never intended to shoot "at" the house itself.

[34]By the same token, nothing which occurred during the cross-examination "undermine[s] confidence" that the verdict would have been the same even if that examination had not occurred. (See *Strickland* v. *Washington, supra,* 466 U.S. 668, 694 [80 L.Ed.2d 674, 698].) This fact negates any possible claim that defense counsel's decision to put defendant on the stand constituted ineffective assistance of counsel.

entitled to consideration of any sympathetic evidence in mitigation. (See, e.g., *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 114-117 [71 L.Ed.2d 1, 11-12, 102 S.Ct. 869]; *People* v. *Haskett, supra,* 30 Cal.3d 841, 863.)

Defendant's counsel failed to object and request an admonition, though an admonition would have cured any harm. Hence, the contention is waived on appeal. (E.g., *People* v. *Hamilton, supra,* 48 Cal.3d 1142, 1184, fn. 27; *People* v. *Green, supra,* 27 Cal.3d 1, 33-34.)[35] In any event, we see no impropriety. The prosecutor merely argued that "the mitigation doesn't really amount to much in its totality," that sympathy for defendant would rob the murder victim of the sympathy he deserved, and that the jurors had promised to "follow the law" and decide the case on the evidence, not on the "distraction" of the sympathy that might "pull at your heart strings."

Yet the prosecutor never suggested that the jury was *prohibited* from considering defendant's mitigating evidence in a sympathetic light, and the jury was expressly instructed that it could do so. The prosecutor himself told the jury at one point that "in the guilt phase, they said you're instructed not to consider sympathy, *but here you should. If* sympathy is *based on the evidence* and you find that evidence exists, then, you must consider it . . . , evaluate it for what it's worth, and then, compare it to the aggravation." (Italics added.) The prosecutor's argument was entirely proper. (E.g., *People* v. *Clark* (1992) 3 Cal.4th 41, 163-164 [10 Cal.Rptr.2d 554, 833 P.2d 561]; *People* v. *Edwards, supra,* 54 Cal.3d 787, 839-840.)

Nor do we accept defendant's claim that by suggesting defendant did not "deserve to live," the prosecutor implied there was a presumption that anyone guilty of a special circumstance murder should be sentenced to death. The prosecutor merely argued that the balance of aggravating and mitigating evidence in this case favored death over the alternative of life imprisonment without possibility of parole.

c. *"Conjugal Visits" Argument.*

Delores Garcia testified for the defense that she loved defendant and intended to marry him regardless of his fate. On cross-examination, the prosecutor elicited her understanding, based on her "study" of prison rules, that if defendant received a sentence of life without parole, she and her children could visit him over weekends in a private space.

---

[35]In almost every instance of penalty phase prosecutorial misconduct defendant claims on appeal, his counsel similarly failed to object and request an admonition. As at the guilt phase, defendant asserts that because such objections would have been futile, his appellate contentions are not waived. We are not persuaded.

Defense counsel later argued to the jury that the love Garcia had expressed for defendant was a reflection that he had some good qualities. In his rebuttal argument, the prosecutor suggested that Garcia's testimony had nothing to do with the proper sentence for defendant. The prosecutor questioned whether "it is appropriate to consider sending the defendant to state prison for life where he may engage in the reward of conjugal visits with his wife, where he may engage in the reward of visiting with his family at Christmastime and other times, maybe receive the disability payments that Mr. Enomoto talked about."

Defendant claims the references to conjugal visits and other possible benefits of prison life were improper. Trial counsel's silence waives the issue on appeal, and it lacks merit in any event.

Defendant first suggests there was no evidence to support the reference to conjugal and family visits. However, it was clearly based on Garcia's testimony that she had "studied up" on prison rules, understood she and her children would be eligible to make such visits, and intended to do so. Defendant also asserts the argument went beyond the relevant sentencing factors, which are limited to the circumstances of the capital offense and the character and background of the offender. (See § 190.3.) However, rebuttal argument is not limited to the statutory sentencing factors. (E.g., *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 791 [230 Cal.Rptr. 667, 726 P.2d 113].) Here, the prosecutor sought only to place Garcia's mitigating testimony in its proper perspective, and to remind the jurors that the sentence defendant sought would allow him to enjoy benefits and relationships, as with Garcia, which he had forever denied his victim. As such, the argument was proper.[36]

Defendant asserts we have condemned penalty argument which suggests the defendant will receive a "free ride" unless sentenced to death. But the case on which he principally relies, *People* v. *Polk* (1965) 63 Cal.2d 443 [47 Cal.Rptr. 1, 406 P.2d 641], is materially distinguishable. There, capital defendants were already under indeterminate life sentences for other crimes, and the prosecutor argued that another indeterminate life term would therefore mean nothing. We deemed such an argument misleading, because it

---

[36]Defendant suggests the prosecutor fostered further prejudicial confusion by objecting to defense counsel's argument, on surrebuttal, that "[c]onjugal visits doesn't mean sex." The prosecutor urged that this was "misrepresentation" based on the dictionary definition of "conjugal." The court sustained the objection and admonished the jury not to consult a dictionary or any outside source, but to decide the case solely on the evidence. No error or prejudice occurred. Until defense counsel raised the issue, the prosecutor had never suggested that conjugal visits were specifically sexual, and there was no evidence to support defense counsel's contrary argument. Accordingly, the court's instruction to decide the case on the evidence, and not to consult the dictionary, was proper.

implied the Adult Authority would violate its duty to take the second sentence into account when deciding the total length of actual confinement. (*Id.* at p. 450.) No such vice appears here. Defendant's claim of misconduct lacks merit.

### d. *Question About Waltrip's Lost Chance for Marriage and Family.*

During cross-examination, the prosecutor asked Garcia whether defendant ever indicated "that he feels it's unfair that Mr. Waltrip will never be able to *get married and enjoy a family*, like he can, even though he's in prison?" (Italics added.) This question was deliberately misleading, defendant insists, because the prosecutor knew, and had succeeded in keeping from the jury, that Waltrip was a homosexual who was HIV positive at the time of his death.

The claim is waived for failure to object, and it lacks merit in any event. The question sought only to learn whether defendant regretted depriving a young person of the opportunities of life in general, which defendant himself might continue to enjoy in some measure even while incarcerated. The prosecutor asked no further questions and made no argument stressing Waltrip's lost chance for marriage and fatherhood. To the extent the jurors noticed the brief reference of which defendant complains, they would necessarily have assumed the question was rhetorical, intended only to pursue the obvious and general theme of injustice as between murderer and victim. No misconduct appears.

### e. *Biblical References.*

Defendant claims the prosecutor improperly invoked the Bible and religious law in support of the death penalty, thus breaching the separation of church and state, diminishing the jury's sense of sentencing responsibility, and injecting extraneous matters into the sentencing determination. Defense counsel's failure to object waives the issue. In any event, we are unpersuaded on the merits.

At the outset of his opening argument, the prosecutor observed that the penalty issue is not about "whose side God is on, because you see, the Bible can be enlisted on both sides." Exodus 20:13 commands that "you shall not kill," the prosecutor noted, but other passages in Exodus suggest that one who kills willfully shall be put to death. The prosecutor reflected that some might believe God determines punishment "in the life hereafter," but jurors must follow the law of California, as applied to the evidence in this case, and go no further. He suggested that each juror might draw upon any "faith

personal to yourself" for the strength necessary to "go through this very difficult process."

Thus, the prosecutor merely exhorted jurors who might harbor strong religious views that they must *not* resort to religious canons to decide the appropriate penalty. He noted that religious laws were in conflict, and, in any event, that secular law must govern over any religious beliefs. This restrained commentary did not invoke "religious authority as supporting or opposing the death penalty" (*People* v. *Sandoval, supra,* 4 Cal.4th 155, 194; see also *People* v. *Wash* (1993) 6 Cal.4th 215, 260-261 [24 Cal.Rptr.2d 421, 861 P.2d 1107]) and thus did not cross the line between permissible and improper argument. (E.g., *People* v. *Freeman, supra,* 8 Cal.4th 450, 515-516; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1325 [248 Cal.Rptr. 834, 756 P.2d 221].)

 f. *Responsibility for Sentencing Decision.*

 Defendant asserts the prosecutor improperly diminished the jurors' sense of sentencing responsibility when he completed his rebuttal argument with the following comment: "You did not start this process. Remember, it is the defendant that is responsible for a decision of death by his killing of Mr. Waltrip on May 23, 1987, not you. He, alone, is responsible for your confrontation with death that you must make. He, alone, is responsible, because he, alone, suddenly, violently, callously, and undeservedly murdered John Waltrip. [¶] And, now, is the time to determine the consequences of that act. [¶] Thank you."

Defendant's failure to object waives the issue, but it lacks merit in any event. The prosecutor sought only to emphasize "that the moral blame for the crimes and their consequences rests with defendant, not with the jurors," and this is not improper. (*People* v. *Fierro* (1991) 1 Cal.4th 173, 247 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)[37] Indeed, the prosecutor made clear that because of the defendant's conduct, the jury must indeed now confront and

---

 [37]Thus in *Fierro,* the prosecutor argued that the defendant " 'wants to try to make you feel guilty for the verdict that you should render in this case based on the facts and the law. You must not allow this to happen, ladies and gentlemen. [¶] You will not be doing your duty as jurors if you do allow that to happen. *A verdict of death in this case will not be quote your fault unquote,* as the defense would like to persuade you. [¶] *It will be the result of this defendant's actions, his choice to be greedy, his choice to satisfy that greed by committing a robbery, his choice to take a gun along in the commission of that robbery, his choice to select Sam and Gertrude Allessie as his victims. [¶] . . . His display of absolute viciousness, of total depravity in stepping over a mortally wounded Sam Allessie, bending down over the man, pushing the end of the barrel of his pistol into Sam's chest, and shooting him again, executing him. [¶] It will be a combination of these facts, ladies and gentlemen, of his conduct and his behavior and his crimes, and the law that the Judge gives you will result in a death verdict in this case. [¶] It will*

make a penalty decision. The prosecutor never intimated that the jurors had only a minimal role in the sentencing process or could shift their sentencing responsibility elsewhere. (See *Romano* v. *Oklahoma* (1994) 512 U.S. 1, __ [129 L.Ed.2d 1, 9-10, 114 S.Ct. 2004, 2010].) No misconduct occurred.

### g. *Argument That Defendant Lacked Remorse.*

Defendant challenges the prosecutor's argument that defendant's extrajudicial expressions of remorse were insincere and reflected only a selfish personal concern about the penal consequences of his crimes. In defendant's view, this argument constituted *Griffin* error (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]) because it was a comment on defendant's exercise of his privilege against self-incrimination, as reflected in his failure to express remorse on the stand. Defendant also claims the prosecutor committed *Boyd* error (*People* v. *Boyd* (1985) 38 Cal.3d 762, 771-776 [215 Cal.Rptr. 1, 700 P.2d 782]) by invoking a nonstatutory aggravating factor, and *Davenport* error (*People* v. *Davenport, supra,* 41 Cal.3d 247, 288-290) by misrepresenting the absence of mitigation as aggravating.

The claims are waived for failure to object, and they are unmeritorious in any event. The prosecutor merely anticipated the predictable defense argument that defendant's expressions of remorse to friends and relatives after the Beacon crimes were factors in mitigation. The prosecutor never mentioned defendant's failure to testify, and he never hinted that the extrajudicial expressions of remorse were less sincere *because defendant had failed to confirm them on the witness stand.* Nor did the prosecutor suggest that the absence of remorse was an independent factor in aggravation. He simply argued that defendant's expressions of remorse were worth nothing. No impropriety occurred.

### h. *Disparagement of Defense Expert.*

Defendant complains of the prosecutor's vigorous attack on the testimony of the defense expert, Dr. Globus, who opined that defendant suffered from organic brain damage. Among other things, the prosecutor accused Dr. Globus of misapplying the results of brain scans performed on defendant. In

---

*not be your responsibility, it will not be your fault.* The law determines[,] when the facts are applied to the law[,] what penalty is appropriate. [¶] You are here as representatives of [the] community to exercise and carry out the law. It is not personal—it is, of course, a personal decision, but I think you see what I'm saying. *It is not a personal responsibility,* it is a personal decision to follow the law and arrive at the results that the law calls for. That's the thing that you must do as jurors in this case.' " (*People* v. *Fierro, supra,* 1 Cal.4th at pp. 246-247, some italics added, some original italics omitted.)

this regard, the prosecutor suggested that Dr. Globus's job was "to save [defendant's] life, now. He's part of a forensic team." The prosecutor claimed he "[did] not fault the defense team for doing anything to save their client's life." However, he asked, "Where's the beef, Doctor? Where's the evidence of it? See, it doesn't exist. It's not in his tests. All the possibilities in the world could happen, but they didn't. No. Doctor Globus, go some place else and sell your tonic water to another forum."

Defendant's failure to object waives the claim, but it must be rejected in any event. ██ As previously discussed (ante, at p. 162), counsel may mount colorful attacks on the credibility of opposing lay and expert witnesses.

Such an attack is not improper simply because it includes epithets intended to ridicule the witness's testimony. Thus, where counsel claims that an expert's conclusions are illogical, he may illustrate the point by describing them in such derisive terms as "tonic water." Nor is counsel prohibited from mentioning the witness's possible bias or interest supported by the evidence. Accordingly, it is not wrong to argue that an expert's conclusions are so implausible as to suggest a lack of impartiality. And counsel is not precluded from reminding the jurors that the expert's findings support the goals of the party who called him, and may therefore not be objective.

██ Defendant urges the prosecutor improperly disparaged opposing counsel (see, e.g., People v. Cummings, supra, 4 Cal.4th 1233, 1302) by implying that counsel had suborned false testimony by Dr. Globus "to save their client's life." However, we see nothing so sinister in the prosecutor's argument. At most, he suggested that the "defense team" may have sought an expert whose technical opinions would be favorable to defendant's case. Since expert opinions are generally subject to reasonable debate, an attorney's good faith selection of a favorable expert does not reflect adversely on counsel's ethics or integrity. An argumentative reminder that defense counsel may have chosen Dr. Globus for this reason is not equivalent to an insinuation that counsel suborned perjury or engaged in deception. (Cf., e.g., People v. Bell (1989) 49 Cal.3d 502, 538 [262 Cal.Rptr. 1, 778 P.2d 129] [argument that " 'it's [defense counsel's] job to throw sand in your eyes' " not improper]; cf. People v. Bain (1971) 5 Cal.3d 839, 845 [97 Cal.Rptr. 684, 489 P.2d 564] [insinuation that defense lawyer assisted client to concoct false story was misconduct].) No improper argument occurred.

### i. Disparagement of Lingering Doubt.

██ An instruction was given that "[i]t is appropriate for the jury to consider in mitigation any lingering doubt it may have concerning defendant's guilt. [¶] Lingering or residual doubt is defined as that state of mind

between beyond a reasonable doubt and beyond all possible doubt." (See *People* v. *Terry* (1964) 61 Cal.2d 137, 146-147 [37 Cal.Rptr. 605, 390 P.2d 381].) Defense counsel argued at length that the jury should consider any lingering doubt about whether defendant intended to kill John Waltrip when deciding the appropriate penalty.

In his own opening argument, the prosecutor had anticipated this lingering doubt claim. He read the jury the lingering doubt instruction it would later hear, then commented: "You may consider this in mitigation in the penalty phase. [¶] Now, I don't understand that really. You're asked to determine whether or not the defendant is guilty beyond a reasonable doubt, not beyond all imaginary doubt, but beyond a reasonable doubt. [¶] You did not have to consider an area above that. Since you did not have to consider an area above that, it's beyond me how anyone could have any lingering doubt that's defined as existing above a reasonable doubt."

At this point, defense counsel objected that the prosecutor was personalizing his argument. Directed by the court to proceed, the prosecutor concluded, "So again, for what that is worth, you should consider it, evaluate it and compare it to all of the aggravation, the substantial aggravation in the case in making your decision."

Defendant claims this argument improperly expressed the prosecutor's personal views about a legal theory applicable to the case. We agree in principle that an attorney's argument should not disparage instructions with which he disagrees. But the prosecutor did not cross that line here.

Though his thoughts were inartfully phrased, the prosecutor sought only to persuade the jurors that little room remained for "lingering" doubt. Having already found no "reasonable" doubt of defendant's guilt, the prosecutor suggested, the jurors should have difficulty retaining a doubt that was more than merely "imaginary." This was not improper. Moreover, the prosecutor quickly abandoned the point when interrupted and thereafter conceded to the jury that it was entitled to consider any remaining reservations it harbored. Under all the circumstances, we find no misconduct.

Even if there had been misconduct, we would not find it prejudicial. Defense counsel argued at length why there remained "lingering doubt" about defendant's intent to kill even though the jury had already determined defendant's guilt. The instructions given confirmed these concepts. Hence, there arose no reasonable likelihood the jury was misled or improperly influenced by the prosecutor's remarks. (E.g., *People* v. *Clair*, *supra*, 2 Cal.4th 629, 663.)

### j. Use of "Kill in Prison" Statement to Dr. Globus.

As noted above, the defense presented several witnesses on the issue of defendant's ability to adjust to long-term prison life. Several jail guards testified that his behavior in custody was no worse than average. Jerry Enomoto, a former Director of the Department of Corrections, testified as an expert witness for the defense. After reviewing defendant's prison file, Enomoto predicted that defendant probably would not present unusual behavioral problems while in life confinement. Dr. Globus expressed similar views.

In his argument, the prosecutor asked rhetorically whether Enomoto knew, when forming his opinion, that defendant had told Dr. Globus a term of life without parole would give him nothing to lose or look forward to, and he "believes he'll kill within five years." Later, over a defense objection, the prosecutor challenged the jurors whether, given defendant's statement, they were willing to trust predictions of his adjustment in prison, thereby risking the safety of numerous prison guards and employees by sentencing defendant to life imprisonment without possibility of parole.

Defendant urges that the prosecutor's references violated the rule against using a defendant's incriminating statements to his forensic psychiatrist for their truth. (E.g., *People* v. *Williams, supra,* 45 Cal.3d 1268, 1327.) We disagree.

It was not improper for the prosecutor to disparage Enomoto's expert opinion by contrasting it with defendant's statement to Dr. Globus. An expert may rely on hearsay in forming his opinion. (Evid. Code, § 801, subd. (b).) Hence, it is permissible, and indeed common, to argue that an opposing expert's opinion is compromised by incomplete information, even where the information the expert failed to consider would not have been directly admissible for its truth. The prosecutor was entitled to suggest that Enomoto's ignorance of defendant's homicidal prediction undermined the reliability of Enomoto's optimism that defendant would adjust without violence in prison.[38]

For similar reasons, it was permissible to ask the jurors whether they wanted to "risk" the safety of prison personnel by relying on "these expert

---

[38]Defendant complains the prosecutor's argumentative description of defendant's statement *was inaccurate. On cross-examination,* the prosecutor had asked Dr. Globus whether his written report noted defendant's statement that "he will *die* or *be killed* or *commit suicide* or kill somebody else within five years." (Italics added.) Dr. Globus agreed with this characterization. Defendant emphasizes that his true statement thus suggested primarily that he would "die or be killed," not that he would kill another person. The prosecutor might have been better advised to use the phrase "*may* kill within five years" (italics added), but we find the distinction insignificant. The clear import of Dr. Globus's report was that defendant expressed

opinions" in light of defendant's statement. Here, as before, the prosecutor took care to argue only that the statement undermined the reliability of assessments by defense experts that defendant presented no danger in confinement. The prosecutor never suggested that the statement should be considered directly as evidence that defendant would kill in prison.[39] No misconduct occurred.

### k. Characterization of James Valdez.

■■■ Through James Valdez, the prosecution presented aggravating evidence that later in the evening of the Beacon crimes, defendant committed an assault on "Joe" during a drug "rip-off." Defense counsel's argument vigorously attacked Valdez's credibility. Counsel characterized Valdez as someone who "could have very easily been charged with murder first degree and even a special circumstance situation" in connection with the Beacon incident. Nonetheless, counsel observed, Valdez had been charged with nothing and had "[gotten] away with everything," though "you're probably sitting there thinking that he was as much involved in this thing as anybody else." Counsel stressed that Valdez also appeared to be a coconspirator in the drug rip-off and might even have "totally made this thing up about the assault on Joe."

In rebuttal, the prosecutor argued that "Valdez has been described to you as just this terrible monster. Well, he's not a pretty person. There's no doubt about that. But Valdez is not a murderer. He's not a rapist. He's not a robber. He's not a kidnapper. He's not an oral copulator." Defense counsel objected that "[w]e don't know about that." The prosecutor responded angrily that "[w]e're talking about the evidence in this case, Judge . . . ." The trial court told the prosecutor to stop shouting, but it did not rule on the objection or admonish the jury.

---

extreme desperation about the prospect of life imprisonment. Defendant said there would be "nothing to hold him back" and indicated he would have nothing to lose. Dr. Globus was "startled" by defendant's statements and described defendant's thoughts as "crazy." The prosecutor was entitled to infer that defendant believed his desperation would cause him to commit homicidal violence if provoked in prison, and that this weighed against the opinions that he would adjust and present no danger.

[39]Thus, the prosecutor argued, "Again, I ask you, *based on the expression of these opinions* in light of the defendant's statement that he will kill within five years, that he doesn't have a release date to look forward to like he did, and there's nothing to hold him back, are you willing to risk the numerous correctional officers' safety, all the lay people in prison, the social workers, the ministers, everyone else? [¶] Are you willing to take that risk *based on these opinions* in light of the defendant's statement of what he intends to do? Especially and also in light of the substantial violence he's already rendered in this community." (Italics added.)

Defendant complains the prosecutor's remarks violated his federal constitutional rights to due process and a reliable penalty determination by referring to matters not in evidence. We disagree. As the prosecutor suggested below, he sought only to rehabilitate Valdez by reminding the jurors that the *defense* attack on this witness was founded on speculation not supported by the evidence. Indeed, the prosecutor made that clear in the jury's presence when he stated, in response to defense counsel's objection, that "[w]e're talking about the evidence *in this case*." (Italics added.) There is no reasonable likelihood the jury misinterpreted the prosecutor's argument as a reference to information about Valdez's criminal history which had not been presented in court.

### 1. *Cumulative Prejudice.*

Defendant asserts that even if no single instance of penalty misconduct warrants reversal, the cumulative effect of the prosecutor's improper argument violated state and federal guaranties of due process and a reliable penalty determination, thus rendering his penalty trial fundamentally unfair. (See *People* v. *Bell, supra,* 49 Cal.3d 502, 533-534; see also *Donnelly* v. *DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 436-437, 94 S.Ct. 1868] [pervasive misconduct as denial of due process].) However, we have found no incidents amounting to misconduct. On the contrary, we have concluded, with respect to each instance cited by defendant, that the prosecutor's argument, taken in context, was proper and could not have been interpreted objectionably. Hence, the claim of cumulative prejudice must be rejected.

### 4. *Constitutionality of 1978 Death Penalty Law.*

Defendant argues that the statutory scheme under which he was sentenced to death violates the federal and state Constitutions in numerous respects. Many of these claims are raised in summary fashion. All lack merit under decisions of the United States Supreme Court and this court.

### a. *Overinclusive Death Eligibility.*

Defendant contends that the statutory scheme violates the Fifth, Eighth, and Fourteenth Amendments because the "special circumstances" which determine death eligibility are so numerous and broad that they fail to "genuinely narrow" the class of persons eligible for the death penalty (*Zant* v. *Stephens* (1983) 462 U.S. 862, 877 [77 L.Ed.2d 235, 249, 103 S.Ct. 2733]), or to provide a "meaningful basis" for distinguishing the "few" murder cases in which death is imposed from the "many" in which it is not

(see, e.g., *Godfrey* v. *Georgia* (1980) 446 U.S. 420, 433 [64 L.Ed.2d 398, 409, 100 S.Ct. 1759]).

Identical claims have previously been rejected with respect to the death penalty scheme applicable in this case and to its closely related predecessor, the 1977 law. California's scheme for death eligibility satisfies the constitutional requirement that it "not apply to every defendant convicted of a murder[, but only] to a subclass of defendants convicted of murder. [Citation.]" (*Tuilaepa* v. *California* (1994) 512 U.S. 967, __ [129 L.Ed.2d 750, 759, 114 S.Ct. 2630, 2635].) Even after 1990 additions by virtue of Propositions 114 and 115, the special circumstances set forth in the statute are not overinclusive by their number or terms (e.g., *People* v. *Stanley* (1995) 10 Cal.4th 764, 842-843 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *People* v. *Crittenden, supra*, 9 Cal.4th 83, 154-156 [noting 1990 amendments]; *People* v. *Wader* (1993) 5 Cal.4th 610, 669 [20 Cal.Rptr.2d 788, 854 P.2d 80]), nor have the statutory categories been construed in an unduly expansive manner (*Crittenden, supra*, at p. 155). Having been found guilty of an intentional murder in the course of a robbery, defendant falls within the "subclass" of murderers who are eligible for the death penalty. (*Pulley* v. *Harris* (1984) 465 U.S. 37, 53 [79 L.Ed.2d 29, 42, 104 S.Ct. 871] [upholding 1977 death penalty law]; see also *People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 467 [24 Cal.Rptr.2d 808, 862 P.2d 808] [noting essential identity of 1978 scheme].)

b. *Vagueness of Sentencing Factors.*

Defendant argues that two sentencing factors set forth in section 190.3 are impermissibly vague under the Eighth Amendment: factor (a) (circumstances of the capital crime) and factor (b) (other criminal activity involving force or violence). Defendant contends that insofar as the standard instructions reflect the statutory language, they do not adequately define these factors or guide the jury's sentencing discretion. However, the United States Supreme Court has upheld the statute against the identical claim and determined that each factor conveys the requisite " 'common-sense core of meaning . . . that criminal juries should be capable of understanding.' [Citation.]" (*Tuilaepa* v. *California, supra*, 512 U.S. 967, __ [129 L.Ed.2d 750, 761, 114 S.Ct. 2630, 2636]; accord, *People* v. *Bacigalupo, supra*, 6 Cal.4th 457, 478; *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 594-595 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; *People* v. *Proctor* (1992) 4 Cal.4th 499, 550-551 [15 Cal.Rptr.2d 340, 842 P.2d 1100].)

Defendant also argues that section 190.3 is unconstitutionally vague because it does not expressly identify which factors are aggravating and which are mitigating. Absent such labels, defendant urges, instructions

conforming to the language of the statute give the jury "no guidance" for "weigh[ing]" the aggravating and mitigating circumstances to determine the appropriate penalty, as the statute requires. (§ 190.3.) This argument has been rejected before for reasons that apply equally here. ■■■ "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." (*Tuilaepa* v. *California, supra,* 512 U.S. 967, __ [129 L.Ed.2d 750, 764, 114 S.Ct. 2630, 2638]; accord, *People* v. *Hawkins* (1995) 10 Cal.4th 920, 964 [42 Cal.Rptr.2d 636, 897 P.2d 574]; *People* v. *Turner, supra,* 8 Cal.4th 137, 208; *People* v. *Howard* (1992) 1 Cal.4th 1132, 1196 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) In any event, no reasonable juror could be misled by the language of section 190.3 concerning the relative aggravating or mitigating nature of the various factors. (*People* v. *Montiel, supra,* 5 Cal.4th 877, 944-945.)

Defendant urges that sentencing factor (i), the defendant's age (§ 190.3, factor (i)), can only be mitigating. By omitting this information, defendant insists, the standard instruction given in this case failed to adequately channel the jury's sentencing discretion.

■■■ We have consistently rejected the contention, noting that chronological age, by itself, is neither aggravating or mitigating, but is used in the statute "as a metonym for *any* age-related matter suggested by the evidence or by common experience . . . that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (*People* v. *Lucky, supra,* 45 Cal.3d 259, 302, italics added; accord, *People* v. *Hawthorne* (1992) 4 Cal.4th 43, 77-79 [14 Cal.Rptr.2d 133, 841 P.2d 118]; *People* v. *Edwards, supra,* 54 Cal.3d 787, 844; *People* v. *Cox* (1991) 53 Cal.3d 618, 674-675 [280 Cal.Rptr. 692, 809 P.2d 351].)

The United States Supreme Court recently confirmed that the "age" factor in California's death penalty law is not impermissibly vague because it can be either aggravating or mitigating. The court observed that "difficulty in application is not equivalent to vagueness. Both the prosecution and the defense may present valid arguments as to the significance of the defendant's age in a particular case. Competing arguments by adversary parties bring perspective to a problem, and thus serve to promote a more reasoned decision, providing guidance as to a factor jurors most likely would discuss in any event. We find no constitutional deficiency in factor (i)." (*Tuilaepa* v. *California, supra,* 512 U.S. 967, __ [129 L.Ed.2d 750, 763, 114 S.Ct. 2630, 2637-2638].)

Defendant urges that section 190.3, factors (d) ("extreme mental or emotional disturbance") and (g) ("extreme duress or . . . substantial domination

of another person") are impermissibly vague because they require a subjective determination of the meaning of "extreme" and "substantial." We recently rejected the identical contention (*People* v. *Stanley, supra,* 10 Cal.4th 764, 842), and defendant presents no persuasive argument for reconsideration. Both these words have commonsense meanings which the jury may be expected to apply. Indeed, in another context, we used the word "extreme" to narrow and clarify the meaning of a special circumstance which may render the defendant eligible for death. (*People* v. *Davenport, supra,* 41 Cal.3d 247, 271 [torture-murder special circumstance requires infliction of "extreme" pain on living victim]; see also *People* v. *Mincey* (1992) 2 Cal.4th 408, 454 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

Moreover, we have often observed that the catch-all language of section 190.3, factor (k), calls the sentencer's attention to "[a]ny other circumstance which extenuates the gravity of the crime," and therefore allows consideration of any mental or emotional condition, even if it is not "extreme." (*People* v. *Clark, supra,* 3 Cal.4th 41, 163; *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1226-1227 [275 Cal.Rptr. 729, 800 P.2d 1159]; *People* v. *Morales* (1989) 48 Cal.3d 527, 567-568 [257 Cal.Rptr. 64, 770 P.2d 244].) Similarly, factor (k) allows consideration of duress that is less than "extreme" and domination that is less than "substantial." Defendant's claim must therefore be rejected.

c. *Prosecutorial Discretion.*

 Defendant urges that the 1978 death penalty law violates the Eighth Amendment's proscription against cruel and unusual punishment because it allows prosecutors "standardless" discretion to decide when to seek the death penalty and thus leads to arbitrary and capricious imposition of the death penalty. He is mistaken. "[P]rosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual punishment." (*People* v. *Keenan, supra,* 46 Cal.3d 478, 505; accord, *People* v. *Stanley, supra,* 10 Cal.4th 764, 843; *People* v. *Visciotti* (1992) 2 Cal.4th 1, 78 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

Defendant also argues that prosecutorial discretion to seek the death penalty contravenes the separation of powers, because it gives the executive branch authority to determine the maximum punishment of a death-eligible murderer. However, we have held that "the death penalty law does not violate the constitutional principle of separation of powers by delegating sentencing authority to the prosecutor. Ultimate sentencing power remains at

all times with the judicial branch." (*People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1024 [30 Cal.Rptr.2d 818, 874 P.2d 248].)

### d. *Other Procedural Safeguards.*

Defendant urges that the 1978 death penalty law is procedurally defective because it fails to require (1) written findings as to the aggravating factors supporting a death judgment, (2) proof beyond a reasonable doubt of any such aggravating factors, (3) jury unanimity on the dispositive aggravating factors, (4) a finding that aggravating factors outweigh mitigating beyond a reasonable doubt, and (5) a finding beyond a reasonable doubt that death is the appropriate penalty. We have rejected these claims many times in the past (e.g., *People* v. *Livaditis* (1992) 2 Cal.4th 759, 786 [9 Cal.Rptr.2d 72, 831 P.2d 297]; *People* v. *Kelly* (1990) 51 Cal.3d 931, 970 [275 Cal.Rptr. 160, 800 P.2d 516]; *People* v. *Marshall* (1990) 50 Cal.3d 907, 935-936 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *Rodriguez, supra*, 42 Cal.3d 730, 777-778), and we do so again.

Defendant also claims the statute is constitutionally deficient because it "fails to require a presumption that life without parole is the appropriate sentence." No authority is cited for the proposition, and it lacks merit. ██ If a death penalty law properly limits death eligibility by requiring the finding of at least one aggravating circumstance beyond murder itself, the state may otherwise structure the penalty determination as it sees fit, so long as it satisfies the requirement of individualized sentencing by allowing the jury to consider all relevant mitigating evidence. (See *Tuilaepa* v. *California, supra*, 512 U.S. 967, __ [129 L.Ed.2d 750, 759-760, 114 S.Ct. 2630, 2635]; *Boyde* v. *California* (1990) 494 U.S. 370, 377 [108 L.Ed.2d 316, 326-327, 110 S.Ct. 1190] [upholding 1978 law's provision that sentencer "shall" impose death if aggravation outweighs mitigation]; *Zant* v. *Stephens, supra*, 462 U.S. 862, 875 [77 L.Ed.2d 235, 248-249] [once defendant is death eligible, statute may give jury "unbridled" discretion to apply aggravating and mitigating sentencing factors].)

### 5. *Automatic Motion to Modify Death Verdict.*

██ Defendant urges that the trial court erred prejudicially in its ruling on the automatic motion to modify the death verdict (§ 190.4, subd. (e)). He claims the court failed to consider relevant mitigating evidence, while it improperly considered a nonstatutory aggravating factor, defendant's conduct in court. Neither contention is persuasive.

In its formal ruling, the court set forth its duty to review the evidence, to make an "independent determination" whether the jury's finding that aggravation outweighed mitigation was contrary to law or the evidence presented,

and to state its findings on the record. The court found beyond reasonable doubt that defendant was guilty of the "very [violent]," fully intentional murder of John Waltrip in the course of a robbery. The murder and the robbery special circumstance were, the court concluded, aggravating circumstances on the issue of penalty. (§ 190.3, factor (a).) The court also found beyond reasonable doubt that defendant had committed all the violent criminal acts presented as aggravating circumstances at the penalty phase (*id.*, factor (b)) and had suffered a prior felony conviction for shooting into an inhabited dwelling (*id.*, factors (b), (c)).

Next, the court determined that there was no mitigating evidence under section 190.3, factors (d) (extreme mental or emotional disturbance), (e) (victim participation), (f) (belief in moral justification), (g) (extreme duress or substantial domination), (h) (diminished capacity through mental disease or defect or effects of intoxication), and (j) (mere accomplice or minor participation). As to factor (h), the court specifically found that the evidence of defendant's intoxication was insufficient to show impairment of capacity and that defendant's brain damage evidence was neither credible nor substantially mitigating. The court concluded that defendant's age, 24 at the time of the capital crime, was neither aggravating nor mitigating. (§ 190.3, factor (i).)

As mitigating evidence under section 190.3, factor (k) (other extenuating circumstances), the court noted that defendant's childhood family environment was "terrible" and "chaotic," that he had made progress in a childhood foster home, that Delores Garcia wished to marry him, and that he might be able to adjust to prison life. The court nonetheless "conclude[d] and [found]" that because the aggravating circumstances "far outweigh any of the mitigating circumstances," the death verdict was not contrary to law or the evidence. Accordingly, the court denied the motion.

Defendant asserts that the court failed to mention numerous aspects of his case in mitigation, such as (1) his expressions of remorse, (2) his relationship with Garcia's daughter, (3) his thoughtful treatment of Garcia's mother, (4) his chronic alcohol abuse and possible fetal alcohol syndrome, which might affect his impulse control, and (5) Dr. Globus's opinion that he would function well in a structured environment. Defendant also complains of the court's failure to recount all the sympathetic or horrifying details of his foster home stay and his troubled childhood environment. Defendant claims we must infer the court therefore violated its duty to weigh these matters in mitigation.

We disagree. The court was obliged only to provide a ruling adequate " 'to assure thoughtful and effective appellate review.' " (*People* v. *Rodriguez,*

*supra*, 42 Cal.3d 730, 794.) Thus, it was not required to recount every detail of matters, such as defendant's family environment, his foster home stay, and his ability to adjust in prison, which it already deemed mitigating. Moreover, the court's ruling indicates its clear understanding of its duty to weigh all the aggravating and mitigating evidence. The court carefully set forth the evidence to which it assigned significant aggravating or mitigating weight. Under these circumstances, the failure to mention other specific matters in mitigation implies, not that they were overlooked or deemed legally irrelevant, but simply that the court found them insubstantial and unpersuasive. (E.g., *People* v. *Wader*, *supra*, 5 Cal.4th 610, 668; *People* v. *Clark*, *supra*, 3 Cal.4th 41, 172; *People* v. *Pinholster* (1992) 1 Cal.4th 865, 971 [4 Cal.Rptr.2d 765, 824 P.2d 571].)

Defendant also objects to a parting comment by the court. Having ruled on the modification motion, the court sought to place on record its view that defendant "was well and fully represented by counsel" during the trial. In an apparent reference to defendant's disruptive midtrial efforts to fire his appointed attorneys, force a competency hearing, and boycott the proceedings, the court observed, "The intentional acts and statements of defendant, throughout the trial, show that the defendant was fully aware of the judicial proceedings and that his attempts to interrupt the proceedings were with the intent to cause a mistrial and to give him any grounds for appeal." The court then repeated its findings that the guilt, special circumstance, and prior-conviction verdicts were proven beyond a reasonable doubt, and that the aggravating circumstances "far outweigh[ed]" those in mitigation. Thereupon, the court pronounced the death judgment.

Defendant infers that the court thus improperly considered his devious courtroom misbehavior as an aggravating factor. Again, we disagree. The context indicates that the court carefully separated its evaluation of the modification motion from its unrelated remarks about defendant's disruptions. Defendant's claim must be rejected.

### 6. *Proportionality Review.*

Defendant asserts the trial court violated his state and federal constitutional rights to due process and a fair trial, and against cruel and/or unusual punishment, by denying his motion for "intercase" proportionality review of his sentence. As below, defendant claims an arbitrary sentencing disparity because the Sacramento County District Attorney files capital charges, while the Yolo County District Attorney does not. However, we and the United States Supreme Court have consistently rejected the notion that "intercase" proportionality review is constitutionally required. (E.g., *Pulley*

v. *Harris*, *supra*, 465 U.S. 37, 50-51 [79 L.Ed.2d 29, 40] [upholding 1977 California death penalty law]; *People* v. *Stanley*, *supra*, 10 Cal.4th 764, 842; *People* v. *Beeler*, *supra*, 9 Cal.4th 953, 998; *People* v. *Crittenden*, *supra*, 9 Cal.4th 83, 156-157 [noting that prosecutorial discretion whether to seek death penalty does not render sentencing scheme arbitrary or capricious]; *People* v. *Adcox* (1988) 47 Cal.3d 207, 274 [253 Cal.Rptr. 55, 763 P.2d 906]; see also *id.* at pp. 275-276 (conc. opn. of Broussard, J.) [noting intercounty disparity in prosecutorial death penalty policy].)

Defendant also claims his sentence is disproportionate to his *individual* culpability, especially considering the lenient treatment of James Valdez, and thus violates state and federal proscriptions against cruel and/or unusual punishment. We do evaluate, on request, whether a particular capital sentence is so "grossly disproportionate" to the offense as to constitute cruel or unusual punishment under article I, section 17 of the California Constitution. (E.g., *People* v. *Mincey*, *supra*, 2 Cal.4th 408, 476.)

However, the punishment received by others who might be involved in the crime is not relevant to such "intracase" proportionality review, because a capital penalty determination is "based on the character and record of the *individual* defendant and the circumstances of the offense. [Citation.]" (*People* v. *Mincey*, *supra*, 2 Cal.4th 408, 476, italics in original; see also *People* v. *Adcox*, *supra*, 47 Cal.3d 207, 274.) Nor does the record disclose an arbitrary disparity of treatment between defendant and Valdez. All the evidence indicates that defendant alone instigated the robbery and intentional murder at the Beacon store.

Defendant claims the sentence is disproportionate to his culpability for the Beacon crimes alone and was artificially enhanced by the "sensational and unrelated" offenses against Judy N. However, as the Constitution allows, the 1978 death penalty statute specifically contemplates that the defendant's character and record, including his perpetration of other violent crimes, is relevant to the penalty determination. (§ 190.3, factor (b).) That defendant committed brutal and degrading assaults against another defenseless victim soon after the capital crime has strong bearing on the appropriate sentence.

Nor is defendant's sentence disproportionate to his culpability for the Beacon crimes alone. Defendant again urges that evidence suggesting his intoxication and brain damage mitigates his mental state at the time of the Beacon robbery and murder. However, both the jury and the court below found that defendant harbored the specific intent both to rob the Beacon store and to kill an innocent victim, John Waltrip. More than ample evidence supports those findings. The evidence also suggests that the fatal knife attack

on Waltrip was "very violent" in nature, though unprovoked by any aggressive action on Waltrip's part. Defendant's individual culpability thus places him well within the class of murderers for whom the Constitution and the statute permit a sentence of death.

### 7. *Cumulative Guilt and Penalty Prejudice.*

Defendant claims the cumulative effect of the errors at each phase of trial denied him his federal constitutional rights to a fair trial and a reliable penalty determination, thus requiring reversal of both the guilt and penalty judgments. However, we have found only minor improprieties in a case well tried under difficult circumstances. Our careful review of the record convinces us that the trial was fundamentally fair and its determinations reliable. No basis for reversal appears.

## III. Conclusion

The judgment is affirmed in its entirety.

Lucas, C. J., Kennard, J., George, J., Werdegar, J., and Arabian, J.,* concurred.

**MOSK, J.**—I concur in the judgment. After review, I have found no reversible error or other defect.

I also largely concur in the opinion prepared for the court by Justice Baxter. But I cannot join in its broad absolution of the prosecutor against defendant's claim of misconduct.

In his summation at the penalty phase, the prosecutor improperly attacked an instruction on "lingering doubt" that the superior court intended to, and did in fact, give the jury. The instruction was this: "It is appropriate for the jury to consider in mitigation any lingering doubt it may have concerning defendant's guilt. Lingering or residual doubt is defined as that state of mind between beyond a reasonable doubt and beyond all possible doubt." (Paragraphing omitted.) The prosecutor's attack was as follows: "You may consider this in mitigation in the penalty phase. Now, I don't understand that really. You're asked to determine whether or not the defendant is guilty beyond a reasonable doubt, not beyond all imaginary doubt, but beyond a reasonable doubt. You did not have to consider an area above that. Since you did not have to consider an area above that, it's beyond me how anyone

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

could have any lingering doubt that's defined as existing above a reasonable doubt." (Paragraphing omitted.) This comment is unambiguous: It challenges the very notion of "lingering doubt" as a matter of law; it does not merely question its applicability on the evidence adduced at trial. Even if it could be deemed ambiguous, it is reasonably likely to have been understood by the jury as indicated above. (See *People* v. *Clair* (1992) 2 Cal.4th 629, 662-663[7 Cal.Rptr.2d 564, 828 P.2d 705].) Surely, the words do not readily allow an inference that "the prosecutor sought *only* to persuade the jurors that little room remained for 'lingering' doubt." (Maj. opn., *ante*, at p. 183, italics added.)

Also in his summation at the penalty phase, the prosecutor improperly used for its truth a statement defendant had made to Albert Globus, M.D., a defense psychiatrist, that "he feels like he will die or be killed or commit suicide or kill somebody else within five years." The prosecutor asked the jury, "based on the expression of . . . opinions" by defense experts that defendant would not be dangerous in prison, "in light of the defendant's statement that he will kill within five years, . . . are you willing to risk the numerous correctional officers' safety, all the lay people in prison, the social workers, the ministers, everyone else? Are you willing to take that risk based on these opinions in light of the defendant's statement of what he intends to do?" (Paragraphing omitted.) Even if it could be deemed ambiguous, it is reasonably likely to have been understood by the jury to employ defendant's statement for a substantive purpose—i.e., to prove the "risk" he posed in prison—and not merely for impeachment—i.e., to attack the soundness of his experts' contrary views. I cannot agree that "the prosecutor took care to argue *only* that the statement undermined the reliability of assessments by defense experts that defendant presented no danger in confinement," or that "[t]he prosecutor *never suggested* that the statement should be considered directly as evidence that defendant would kill in prison." (Maj. opn., *ante*, at p. 185, italics added.)

Be that as it may, the prosecutor's misconduct does not require reversal. Neither does any other defect. Accordingly, I concur in the judgment.

Appellant's petition for a rehearing was denied July 10, 1996.